UNITED STATES of America, Plaintiff,

v.

B.N.S.*, Defendant.

No. CR82–055–B.

United States District Court,
D. Wyoming.

Feb. 11, 1983.

Richard A. Stacy, U.S. Atty., Cheyenne, Wyo., for plaintiff.

James H. Barrett, Cheyenne, Wyo., for defendant.

## MEMORANDUM OPINION AND ORDER

BRIMMER, District Judge.

This matter came before the Court for a hearing upon the United States' Motion to Transfer. The juvenile defendant appeared in person, with his mother, his father and his attorney. The Court then reviewed the pleadings, heard the testimony, ordered the Defendant committed for a period of observation, study, and psychiatric examination, and has carefully studied the evidence and reports of such observation and study. The Court now makes the following findings and conclusions of law as required by 18 U.S.C. Section 5032, which are in conformity with its prior oral ruling on this matter:

The juvenile defendant in this action, who was 17 years of age at the time, is charged with first-degree murder, alleged to have occurred on or about September 24, 1982, near Arapahoe, Wyoming. The United States Attorney has filed a certificate as required by 18 U.S.C. Section 5032, showing that both the juvenile and the victim are Indian, and that the offense occurred within the Wind River Indian Reservation. No court of the State of Wyoming has jurisdiction over the juvenile in this case. It is undisputed that in circumstances like this the jurisdiction of the federal courts is exclusive and that this Court has jurisdiction to proceed under 18 U.S.C. Sections 5031–5042, of the Federal Juvenile Delinquency Act of 1974, P.L. 93–413.

* Pursuant to the provisions of 18 U.S.C. § 5038   only the initials of the juvenile are used.

The Attorney General, through the United States Attorney for the District of Wyoming, filed a motion on September 28, 1982, to transfer and to proceed against the juvenile defendant as an adult. On October 1, 1982, a hearing on the transfer motion was held, but the Court felt that additional information was essential in order to make a proper ruling on the motion. With the consent of the juvenile and his attorney, the juvenile was committed to the custody of the Attorney General for observation and evaluation on an in-patient basis. He was then returned to Cheyenne, Wyoming and released to the custody of his father on December 3, 1982. While the period of his detention exceeded thirty (30) days, the period of observation was consented to by both the juvenile and his counsel, and the delay was in the interests of justice. Thus the time consumed is excluded from any applicable time limits under 18 U.S.C. Section 5036. The juvenile has not been in custody since December 3, 1982, and therefore time elapsed after that date is not relevant for purposes of Section 5036. *U.S. v. Cuomo*, 525 F.2d 1285 (5th Cir.1976 (Tex.)). Further, due to the extremely serious nature of the alleged offense, it is essential that the Court be fully informed of all relevant facts in reaching a decision on this motion. The Court has now received and reviewed the reports from the doctors who examined the juvenile, has had its probation officer make an extensive investigation of places of possible confinement, and is now able to proceed.

Section 5032 provides that in order for the transfer to be granted, the Court must find that "such transfer would be in the interest of justice." In making that determination, the Court is required by statute to consider and to make specific findings with regard to several factors, which are: the age and social background of the juvenile, the nature of the alleged offense, the extent and nature of the juvenile's prior delinquency record, the juvenile's present intellectual development and psychological maturity, the nature of past treatment efforts and the juvenile's response to such efforts, and the availability of programs designed to treat the juvenile's behavioral problems.

The events of this case are truly sad and tragic, both for society and for the young man who is the Defendant. This juvenile was born on January 15, 1965, and is eighteen years old. At the time of the offense and the commencement of this action, he was seventeen years old. He is an enrolled member of the Arapahoe tribe. His home-life has been unstable and notable for its violence. His parents are divorced. Although he has spent time with both parents, he has lived primarily with his mother on the Wind River Indian Reservation in Wyoming. His mother has been married three times, and his father twice. It seems that in each of his parents' households the juvenile has often observed the adults engage in physical violence against each other. He reported that both his father and his first stepfather beat his mother, and that she occasionally retaliated in kind. Additionally, an uncle committed suicide, a cousin to whom he was close killed his own father in self-defense, and he himself prevented another cousin from shooting a friend. He also reported that he attempted suicide when he was thirteen or fourteen.

While the violence to which Defendant has been exposed has undoubtedly had an effect on him, the psychological reports presently before the Court indicate that he has also been greatly affected by the amount of family responsibility which he has had to assume. The juvenile's mother placed the burden of caring for his younger sisters and brother upon him when he was as young as ten years old. He himself expresses a strong sense of responsibility for his younger siblings and for his mother. The reports indicate that he is somewhat withdrawn and that he has suppressed a great deal of anger.

Defendant has done well in school and has not been previously involved in serious violations of the law. He is well-liked by

both his teachers and his classmates. There is no indication of any major disciplinary problems in school. The records of the tribal court reflect that he was convicted of a curfew violation and possession of alcohol in December 1981, and that a jury trial on a charge of public intoxication is currently pending. Records also reflect that in March 1982 he was convicted of being a wayward child, but his mother explained that she herself brought that charge against him because he was living with an older friend of whom she disapproved; there is no indication that the charge was based on any criminal activity by the juvenile. There is no other evidence of any delinquent behavior, nor is there any record at all of serious offenses. Because the juvenile has not exhibited behavioral problems nor engaged in major legal violations, there has been no reason to provide him with any kind of treatment. Consequently, the juvenile has not received any treatment for behavioral problems.

As may be inferred from his school career, his own statements, and the doctors' reports, the juvenile is of average intellectual ability. He has performed reasonably well in school, and expresses a desire to attend college. All available evidence indicates that his intellectual development is average for a boy his age. The required finding as to the juvenile's psychological maturity is more difficult to make. The statute does not define the term, nor do the psychological reports before the Court employ it. Nevertheless, based upon the Court's understanding of the term, the juvenile again appears to be of average psychological maturity for his age.

The juvenile is charged with the murder of his stepfather. It is charged that he stabbed and killed his stepfather after having argued with him. The juvenile allegedly cut his stepfather across the forehead with a knife during an argument. Then, after his stepfather went into a bedroom, locked the door, and hid in a closet, Defendant, it is charged, while in an extreme state of intoxication so that he has only flashes of memory of his conduct, broke through the door and stabbed him several times in the chest, inflicting wounds from which he subsequently died. Clearly, the crime with which the juvenile is charged is extremely serious. If he were tried, convicted and sentenced as an adult, he would face at least a substantial prison sentence. In order to make treatment as a juvenile a viable alternative, facilities for dealing with such youthful offenders must be available. Several facilities in which this juvenile could be placed, and in which he would receive the guidance and structure that he needs, do exist.

Such then, are the facts which the Court has considered in determining whether to transfer the juvenile defendant to adult status. Under the Juvenile Justice Act, the purpose of the evaluation is to determine whether, based on the factors enumerated in the statute, there is a reasonable and realistic basis for believing that the juvenile defendant can be rehabilitated. 1974 U.S.Code Cong. & Admin.News, p. 5320. This policy is based upon the belief that "[r]eprehensible acts by juveniles are not the consequence of mature and malevolent choice but of environmental pressures (or lack of them) or of other forces beyond their control. *United States v. E.K.,* 471 F.Supp. 924, 931 (D.C.Or.1979). In such circumstances, the Juvenile Justice Act reflects a reasoned policy decision of Congress that society's interest in punishing criminal activity is outweighed by its interest in rehabilitating the youthful offender. *U.S. v. Mechem,* 509 F.2d 1193 (10th Cir., 1975). As Judge Burns stated, "Where realistic chance for rehabilitation exists, the balance ought not to tip in recognition of the general societal interests subsumed in the broader sense of the word 'justice'." *U.S. v. E.K.,* supra, at 932. Thus, if the juvenile's potential for rehabilitation is good, and facilities exist so as to allow that potential to be realized, it is not "in the interest of justice" to transfer the juvenile to adult

status. On the importance of rehabilitation as a factor in passage and application of the Act, see *U.S. v. J.D.*, 525 F.Supp. 101, 103 (N.Y.1981); Sen.Rpt. 93–1011, reprinted in 1974 U.S.Code Cong. & Admin.News, 5283–5290.

In the present case, the serious and violent nature of the crime cannot, and should not, be minimized. However, weighed against that act itself are the undisputed facts of the juvenile's past life and future potential. He has appeared to function reasonably well both socially and academically. He has not previously exhibited violent or dangerous traits. This act seems to have been the expression of years of suppressed anger, and triggered by excessive consumption of alcohol. While such factors in no way excuse the act, they do tend to shed light upon its causes. Further, the psychiatric reports indicate, particularly a fine report which the Court has received from Dr. John M. MacDonald, M.D., Director of Forensic Psychiatry of the University of Colorado Health Services Center, and the Court finds, that the juvenile's potential for rehabilitation is excellent, that there is slight risk of further bloodshed, and that "his prospects for the future are good" if he is placed in facilities where he will receive the treatment he needs. Thus the Court cannot find that a transfer would be in the interest of justice. It is therefore

ORDERED that the United States' Motion to Transfer be, and the same hereby is, denied, in accordance with the Court's previous oral ruling on this matter.