**In re T.W., A juvenile and an Indian,**

**and**

**R.T., a juvenile and an Indian.**

**No. 86–CR–105.**

United States District Court,
E.D. Wisconsin.

Feb. 6, 1987.

Ann Kisting, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff.

Elizabeth Adelman, Milwaukee, Wis., for T.W.

Thomas Brown, Milwaukee, Wis., for R.T.

## DECISION AND ORDER

WARREN, District Judge.

The United States commenced this action on September 26, 1986, with a one-count Information charging the juveniles, T.W. and R.T., as follows:

> That on or about September 15, 1986, at or around the City of Neopit, in the State and Eastern District of Wisconsin and within Indian country,
>
> T.W., an Indian and a juvenile,
>
> and
>
> R.T., an Indian and a juvenile,
> committed a violation of law whereby they became juvenile delinquents, in that they knowingly, unlawfully and with malice aforethought, caused the death of Curtis Tourtillott, an Indian, committed in the perpetration of a robbery,
>
> All in violation of 18 U.S.C. §§ 1153, 1111(a), 2, and 5031, *et seq.*

Two days prior to filing this Information, the United States Attorney certified to this Court, pursuant to 18 U.S.C. § 5032, that the juvenile court of the State of Wisconsin does not have jurisdiction over the juvenile defendants and, as such, there is a substantial federal interest to warrant the exercise of federal jurisdiction.

On October 16, 1986, the Government moved this Court, pursuant to 18 U.S.C. § 5032, for permission to proceed against the juveniles as adults. Both juveniles were 16 years old on the date of the alleged crime.

18 U.S.C. § 5032 provides, in part, as follows:

a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence or an offense described in section 841, 952(a), 955, or 959 of Title 21, criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice ...

■ As a preliminary matter, it should be noted that "the proceeding held upon hearing a motion to transfer is such a 'preliminary hearing in a criminal case' that the traditional rules of evidence for the conduct of trial do not apply." *United States v. E.K.*, 471 F.Supp. 924, 929 (D.Or. 1979); Fed.R.Evid. 1101(d)(3). However, the juveniles must receive a hearing at which they are "accorded all due process rights." *Id.* This hearing must afford "procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement[s].…" *Kent v. United States*, 383 U.S. 541, 553, 86 S.Ct. 1045, 1053, 16 L.Ed.2d 84 (1966). Finally, for purposes of the hearing, the Court may assume the truth of the offense as alleged. *United States v. Means*, 575 F.Supp. 1068, 1069 (D.S.D.1983).

In determining whether or not it would be in the "interest of justice" to transfer a juvenile and allow him to be tried as an adult, 18 U.S.C. § 5032 directs as follows:

Evidence of the following factors shall be considered, and findings with regard to each factor shall be made in the record, in assessing whether a transfer would be in the interest of justice: the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems.

On three separate days—October 22, 1986, November 6 and 10, 1986—the Court conducted the requisite waiver hearing whereat it received evidence both in the form of documents and live testimony from twelve expert and fact witnesses. Further, the Court, on its own initiative, took testimony from both juveniles. The evidence adduced at the hearing addressed each of the aforementioned § 5032 factors. Finally, the Court in its *Order* of December 12, 1986, committed R.T. to the custody of the Attorney General for inpatient observation and study at the Lincoln Hills School at Irma, Wisconsin. The Court directed that the study should contain a psychiatric evaluation and should seek various information outlined in the Order. On January 29, 1987, the Court received the written report from the Lincoln Hills School personnel detailing their evaluations of R.T. Upon review of all of the pertinent information presented, the Court is now prepared to make its findings regarding each of the § 5032 factors and to determine whether a transfer of the juveniles would be in the interest of justice.

## I

### AGE AND SOCIAL BACKGROUND

T.W. is a 16–year-old (d.o.b. April 13, 1970) Menominee Indian and at the time of the offense charged was living on the Menominee Indian Reservation. His parents divorced approximately two years ago. Since the divorce, he has resided with his mother and other relatives, including his cousin, R.T. T.W. has one full sibling, a fourteen-year-old sister, and five half siblings, all older than himself and who are the product of T.W.'s father's first marriage.

The evidence received at the waiver hearing indicates that T.W. hails from a poor home environment. FBI Special Agent W. Edgar Rowland testified at the waiver hearing that T.W.'s parents have had numerous contacts with tribal law enforce-

ment authorities, usually alcohol related. Further, T.W.'s mother is currently on federal probation for firing a gun at T.W.'s father and for burning down the trailer in which the family lived.

R.T. is a 17–year-old (d.o.b. January 31, 1970) Menominee Indian and at the time of the offense was living on the Menominee Indian Reservation with his mother. R.T.'s parents separated approximately 4–5 years ago. After the separation, R.T. and his four siblings lived with his father. In his interview with Dr. Fredrick A. Fosdal, the government's psychiatric expert who interviewed both juveniles, R.T. claimed that his father physically beat him and his siblings. Eventually all of the children moved out of their father's home and three of them, including R.T., moved into their mother's home located in Neopit, Wisconsin on the Reservation.

Both of R.T.'s parents are unemployed and live off government relief. Both have had numerous contacts with tribal law enforcement authorities, as shown by the tribal police reports submitted as exhibits at the waiver hearing. These contacts, as described by the pertinent police reports, indicate that both parents have a history of alcohol abuse and both have engaged in alcohol inspired behavior or activities requiring law enforcement intercession or arrest.

## II

### SERIOUSNESS OF THE OFFENSE

This section pertains to both juveniles since the government alleges that they were equally culpable co-participants in committing the crime charged.

There can be no dispute that the offense charged, when taken as true as must be done at this stage, is very serious. The evidence presented at trial depicts the following circumstances concerning the offense charged:

(1) the death of Curtis Tourtillott occurred as the direct result of a beating administered by the two juveniles;

(2) the victim was extremely intoxicated during the beating;

(3) an autopsy of the victim revealed that the victim suffered repeated kicks/blows resulting in contusions to various areas of his body;

(4) the autopsy further revealed an absence of any self-defensive wounds (*i.e.*, bruises to the forearms and hands which would be expected if the victim had attempted to defend himself) permitting an inference that the victim was unable to defend himself—possibly due to intoxication or unconsciousness;

(5) a short time after administering the beating to the victim, the juveniles returned to the scene of the crime and passed by the fallen victim offering no aid, apparently indifferent or oblivious to the victim's plight;

(6) following the lethal assault, the juveniles stole the tribal fire truck and engaged in a crime spree resulting in damages to various vehicles and culminating in a high-speed chase through the Reservation until the police were able to stop the juveniles in the stolen fire truck; and

(7) when ultimately stopped, each juvenile attempted to avoid apprehension.

## III

### EXTENT AND NATURE OF PRIOR DELINQUENCY RECORD

No significant record exists for T.W., although he currently awaits court proceedings on an ordinance theft violation allegedly occurring in Shawano County. Further, on March 29, 1982, a tribal officer took a BB gun away from T.W. and, on July 23, 1981, a citizen complainant reported that T.W. and his brother had been "picking on" the citizen's daughter.

R.T. possesses a much more extensive juvenile record. Menominee tribal police reports reveal R.T.'s involvement in a number of incidents:

—On March 15, 1985, R.T. allegedly committed a drug ordinance violation by having marijuana cigarettes in his possession while at school;

—a police incident report alleges that on May 1, 1985, R.T. had "stripped" a bicycle;

—a police incident report and citation dated May 23, 1985 charge R.T. with failing to maintain school attendance;

—a court referral dated June 7, 1985 reported that R.T. and his brother allegedly threw rocks at their mother's former boyfriend and allegedly attacked him with sticks;

—a police report alleges that on June 16, 1985 R.T. was apprehended while driving his father's truck without a driver's license; and

—a police report alleges that on June 22, 1985, R.T. was in violation of curfew.

R.T. also has an extensive history of problems at school. In 1980, due to his poor attention span, sporadic effort, and poor comprehension, R.T. was referred by school authorities for an evaluation of a learning disability. This evaluation found R.T. qualified for learning disability treatment and he has since been receiving services. In 1984, R.T. was referred for an assessment of emotional disturbance. This referral for study resulted from R.T.'s various disciplinary problems during the 1984 school year. These disciplinary problems included threatening an aide, leaving room without permission, "chew", "very disruptive behavior in class (4 times)", "temper tantrums, *i.e.*, throwing books onto floor, slamming cabinets and doors as leaving room", fighting with another student, throwing pencils at a substitute teacher and tardiness. The evaluation concluded that R.T. qualified for emotional disturbance. On November 12, 1985, R.T. was suspended from school for three days for "[throwing] books and papers all over the classroom." Finally, R.T. was expelled from school on January 20, 1986, for striking a teacher.

## IV

### PRESENT INTELLECTUAL DEVELOPMENT AND PSYCHOLOGICAL MATURITY

Regarding T.W.'s intellectual development, the evidence presented at the hearing indicates that his verbal IQ level lies within the low-average to average area. His scholastic achievements have been hindered by a learning disability although various teachers and school officials testified that T.W.'s scholastic efforts were commendable.

As to T.W.'s psychological maturity, the hearing testimony was in conflict. Various persons who have had contact with T.W. on the Reservation testified that he is a likeable, polite and personable youth possessing a maturity level commensurate with other 16 year olds on the Reservation. To the contrary, T.W.'s expert, Psychologist Dr. Mark Ackerman, examined the youth and concluded that T.W. had a social maturity level of a 12 to 14 year old.

The Court finds that both T.W.'s intellectual development and his psychological maturity levels are less than that of a typical 16 year old. The Court readily admits the nebulous nature of such an assessment, proof of which is reflected in the conflicting testimony at the hearing. Regardless, upon considering the testimony and evidence presented at the hearing, and in particular after considering T.W.'s own testimony taken pursuant to the Court's questioning, the Court is confident in its finding that T.W. possesses a diminished level of intellectual development and psychological maturity relative to other youths of his age.

Regarding R.T.'s intellectual development and psychological maturity, the Court received Dr. Fosdal's testimony and his written report. Further, as noted above, in its *Order* of December 12, 1986, the Court ordered R.T. committed to the custody of the Attorney General for inpatient observation and study at Lincoln Hills School. The Lincoln Hills School personnel have completed their study of R.T. and have submitted a detailed report of their evaluations.

The Court finds that R.T.'s intellectual development is less than that of a typical 17 year old. R.T.'s performance on recently administered intelligence tests places him in the "borderline" range of intellectu-

al functioning. As noted above, he has a history of learning difficulties and has been diagnosed as possessing a learning disability.

The Court also finds that R.T.'s maturity level is less than that of a typical 17 year old. As described in the report from Lincoln Hills School, R.T.'s lack of maturity is reflected in his inability to deal with relatively minor difficulties and in his inability to appreciate the seriousness of relatively grave difficulties, including his alleged involvement in the death of another human being.

## V

### NATURE OF PAST TREATMENT EFFORTS AND RESPONSE TO TREATMENT

The government proffered no evidence regarding past efforts to treat T.W.

As stated previously, R.T. has been diagnosed and treated for a learning disability and an emotional disturbance. From the record it appears that these efforts to treat R.T. have been unsuccessful. Indeed, it appears that R.T.'s emotional disturbance remains intact as demonstrated during his recent inpatient placement at Lincoln Hills School pursuant to the Court's order. In his brief stay at Lincoln Hills School, R.T. was disciplined for various minor violations of school rules and also engaged in more serious misbehavior, including threatening a counselor and fighting with another student. The Court finds that R.T. has not responded positively to past treatment efforts and that he still exhibits challenging, reactionary and physically aggressive behavior.

## VI

### AVAILABILITY OF PROGRAMS DESIGNED TO TREAT JUVENILE'S BEHAVIORAL PROBLEMS

If found delinquent under the federal juvenile delinquency statutes, the juveniles can be placed in a juvenile facility until their twenty-first birthday. Juveniles are not usually handled within the federal prison system but, instead, the federal government contracts with state facilities to board juveniles adjudicated delinquent under federal law.

Testimony was received concerning potential juvenile facilities available for placement of the juveniles. Wisconsin has one such facility, Lincoln Hills School, which will hold a juvenile until the juvenile's nineteenth birthday. The Lincoln Hills facility offers educational programs consisting of middle and high school education, a GED program, reading tutors and various vocational programs. Further, Lincoln Hills School has a staff of social workers and counselors offering guidance to the juveniles housed there. Testimony was also received regarding the Southwest-Multi Correctional Center located in Dickinson, North Dakota, which can hold juveniles until their twenty-first birthday. The Dickinson facility offers an education program and a formal drug alcohol program.

## VII

### RULING

In determining whether a transfer would be in the "interest of justice", the Court must examine the juvenile's prospects for rehabilitation before his twenty-first birthday. Specifically, the Court focuses on whether applying the juvenile justice rehabilitation system to the juvenile's diagnosed intellectual and behavioral problems would likely prove worthwhile or nothing more than a futile gesture. *United States v. E.K.*, 471 F.Supp. 924, 932 (D.Or.1979).

Upon applying the aforementioned § 5032 factors to the facts pertaining to T.W., the Court cannot find that exposing the juvenile to the juvenile justice rehabilitation system will prove to be a futile gesture. The Court bases this finding on several relevant items. First, as stated above, no past efforts have been made to treat T.W.'s problems. Second, apparently responsible persons in positions of authority who have had contact with T.W. testified at the hearing that the juvenile has previously exhibited various redeeming qualities, including an affable personality and a caring

attitude towards others. Third, as described above, there exists juvenile facilities available to treat T.W.'s intellectual shortcomings and behavioral disorders. Finally, the juvenile's home environment was quite unstable, indeed tumultous, and his withdrawal from this mileau hopefully will benefit and rectify his development.

■ The Court cannot optimistically assess R.T.'s situation and future. R.T.'s manifold emotional problems coupled with his intellectual and learning shortcomings render him a poor candidate for short term treatment in the juvenile correction system. Rather, a waiver into the adult court system and, if convicted, a longer term placement in a facility designed to work with young adults would be more beneficial to the needs of R.T. and to those of society at large.

R.T. has previously displayed on numerous occasions a physically aggressive disposition capable of inflicting violent assault upon others. As such, R.T. poses a considerable danger to society. Further, the record lacks any indication that R.T.'s many problems can be cured in the short-term. Indeed, based on R.T.'s extensive prior contacts with legal authorities, some of which displayed his violent nature; his numerous problems in school including a learning difficulty and various emotional problems manifesting themselves in aggressive behavior; his unresponsiveness to past treatment efforts; the serious nature of the alleged offense and R.T.'s involvement therein; and the unlikelihood that R.T.'s various problems can be effectively treated in the juvenile correction system, the Court determines that R.T. should be transferred to the adult court system for prosecution.

## VIII

### CONCLUSION

Accordingly, the Court hereby DENIES the government's motion to transfer T.W. into adult court and GRANTS the government's motion to transfer R.T. into adult court.