**UNITED STATES of America, Plaintiff,**

v.

**C.J.T.G., Defendant.**

**Criminal No. 94–279(PG).**

United States District Court,
D. Puerto Rico.

Sept. 21, 1994.

Antonio R. Bazán, Assistant U.S. Attorney, San Juan PR, for plaintiff.

Miguel A. Nogueras, Assistant Federal Public Defender, San Juan PR, for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

### Background

Defendant C.J.T.G. was charged with aiding and abetting three co-defendants in committing a carjacking, in violation of 18 U.S.C. § 2119, and possessing a firearm during the commission of the carjacking, in violation of 18 U.S.C. § 924(c)(1). The firearms charge was dismissed as violative of defendant's rights under the Double Jeopardy clause of the Fifth Amendment.

The government has moved for an order transferring defendant to adult status for prosecution and trial on the carjacking count that remains. Magistrate Judge Delgado issued a Report and Recommendation recommending that the government's motion be denied. For the reasons set forth below, the Magistrate Judge's Report and Recommendation is **APPROVED** and the government's motion to transfer defendant to adult status is **DENIED**.

### Introduction

Transfer of juveniles to adult status is controlled by the language of 18 U.S.C. § 5032. Transfer of a juvenile is permissible only after compliance by the government and the Court with several procedural requirements. The government has dotted its i, certifying to the Court on September 1, 1994 that defendant is charged with "crimes of violence which are felonies and that there is a substantial federal interest in the case and the offense which warrants the exercise of federal jurisdiction." The Court has crossed its t, Magistrate Judge Delgado on September 16, 1994 having held a hearing on the government's motion. The Magistrate Judge heard testimony from defendant, defendant's aunt Nilda Guzmán–Vázquez, clinical psychologist Dr. Carol Romey, Pre-trial Services Officer Rafael Gelpí, and Federal Bureau of Investigation Special Agent Miguel A. Alba. Under § 5032, the Court now must evaluate the government's assertion that prosecution and trial of defendant as an adult would be "in the interest of justice."

Pursuant to the statute, the "interest of justice" is measured, at least in part, by consideration of six specified factors. The Court adopts as its own the Magistrate Judge's findings of fact as to each of these factors, which are summarized below.[1]

1. The government has filed a motion entitled "Objections to Magistrate's Report and Recom-

### Facts

*Age and social background of the juvenile:* Defendant was 16 years old at the time of the incident underlying the charges in this case, and is 17 years old now. He is the second of six children.[2] Defendant lives with his mother and siblings in Naranjito, Puerto Rico, and enjoys the support of a large extended family. Several relatives offered to serve as third-party custodian for defendant in the event of his release on bail. Since the date of the Magistrate Judge's Report and Recommendation, the Court approved the recommendation of Pre-trial Services Officer Gelpí that defendant be released to the custody of his aunt, Nilda Guzmán–Vázquez.

*Nature of the alleged offense:* Defendant is charged with aiding and abetting three co-defendants in the commission of a carjacking during which the victim was killed by a gunshot. After the incident but before dying from the wounds allegedly inflicted by the defendants, the victim informed the police of the names of the juvenile's three co-defendants, and alleged that a fourth individual participated in the incident. The victim was unable to name the fourth assailant. The victim identified one of the juvenile's co-defendants as the shooter. Approximately one hour later, the police arrested the juvenile and two co-defendants, who were driving an automobile matching the victim's description of the one driven by his attackers.

*Juvenile's prior delinquency record:* None.

*Juvenile's intellectual development and psychological maturity:*[3] Clinical psychologist Dr. Carol Romey submitted a "Psychodiagnostic Evaluation Report" (hereinafter "Romey Report") and testified at the hearing before the Magistrate Judge. Dr. Romey found that defendant dropped out of school at age 13, after failing sixth grade. Although Dr. Romey found that defendant may not be classified as "mentally retarded," his I.Q. scores (Verbal—50; Performance—49; Full Scale—43) place him in the lowest percentile rank (.1%) when compared with his age group. Nine of eleven subtest scores reflect an age equivalent of less than ten years. Defendant's scores fall in the classification of "mentally deficient." Defendant achieved a Verbal Comprehension Factor Score equivalent to that expected from a seven- to eight-year old. This score measures the "cognitive areas of socially acquired information and awareness of socially appropriate norms and behavioral patterns *especially in the area of cause and effect.*" Romey Report at 6 (emphasis added).

Dr. Romey also found that defendant has "very little affect." *Id.* at 8. Defendant "appears to prefer to be alone, in a simple world where little is expected of him and he can maintain his inner world with little stress." *Id.* Nonetheless, "there are no indicators of pathological signs in the test battery that would indicate possible risk factors for the community and/or C.J.T.G." *Id.*

*Past treatment efforts:* None.

*Availability of programs designed to treat the juvenile's behavioral problems:* Dr. Romey found that defendant's behavioral problems may be remediable by immersion in educational and psychological treatment programs. "C.J.T.G. ... appear[s] to be in need of intensive remedial education, and the psychological effects of repeated school failure on self esteem and achievement expectations should be attended to." *Id.* Appropriate treatment appears to be available at the Proyecto Especial Para Adolescentes de Ho-

mendation." The government appears to object to the Magistrate Judge's legal conclusion that transfer of the juvenile to adult status would not be "in the interest of justice," and to a single specific factual finding. Therefore, the Court shall make a *de novo* determination as to the factual finding to which the government offers an objection and as to the Magistrate Judge's legal conclusion.

2. The Magistrate Judge's finding that defendant is one of five children is contradicted by Dr. Romey's evaluation report (attached to Docket # 38), the government's Brief in Support of Motion to Proceed Against Juvenile as Adult (Docket # 40), and defendant's motion in opposition thereto (Docket # 42).

3. The government objected to the Magistrate Judge's finding that defendant's "overall performance equates the functioning level of a 7 to 8 year old child." The Court's findings as to the defendant's intellectual capacity are set forth in this section.

gares Crea, located in Juana Diaz, Puerto Rico. Several other programs, including the Cuerpo de Voluntarios al Servicio de Puerto Rico and the Hogares Albergue Para Menores, appear to offer appropriate services.

### Discussion

■ The government correctly observes that the First Circuit has held that the "gravity of the offense allegedly committed by a defendant *may* outweigh the other factors in consideration of a transfer request." *United States v. H.M.M.S.*, 838 F.Supp. 30, 32 (D.P.R.1993) (citing *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir.1984) (emphasis added)). Indeed, numerous juveniles have been transferred to adult status to defend against charges not significantly more heinous than those brought against C.J.T.G. *See e.g., United States v. Alexander*, 695 F.2d 398, 401 (9th Cir.1982), *cert. denied* 462 U.S. 1108, 103 S.Ct. 2458, 77 L.Ed.2d 1337 (1983) (upholding trial judge's determination that potential for rehabilitation was outweighed by the nature of offense, premeditated murder by shooting of four individuals); *H.M.M.S.*, 838 F.Supp. at 31 (juvenile charged with carjacking resulting in death of victim).

■ The calculus is not mandatory, however, because § 5032 does not establish an immutable recipe. *Hemmer*, 729 F.2d at 17–18 ("[I]t is within the district court's reasoned discretion as to what weight to assign each factor.") (citation omitted). In general, § 5032 permits trial judges to exercise broad discretion in determining whether a transfer would be "in the interest of justice." "Such a determination is ... left to the sound discretion of the district court." *Id.* at 18 (citation omitted).

■ The Court has reviewed the information provided by Dr. Romey's evaluation and testimony, as well as the Magistrate Judge's thorough exploration of defendant's personality and intellectual limitations, and the availability of appropriate treatment programs. Although defendant's overall intellectual and

psychological development have been severely impaired, Dr. Romey found defendant's reading and writing abilities to be at a somewhat higher level. Dr. Romey also found that defendant does not appear to be addicted to drugs or alcohol, and does not pose a danger to the public. This evidence, and the Magistrate Judge's enlightening analysis, persuade the Court that C.J.T.G.'s behavioral problems may be remedied by exposure to educational and psychological treatment programs. This likelihood outweighs the other factors listed in § 5032, including the nature of the offense with which the defendant is charged. In light of C.J.T.G.'s otherwise unmarred past, strong family support, and the remediability of his intellectual and psychological problems, the Court finds that it would be contrary to the interest of justice for C.J.T.G. to be prosecuted and tried as an adult.

**THEREFORE,** the government's Motion to Transfer Juvenile to Adult Status (Docket # 40) is **DENIED.**

**IT IS SO ORDERED.**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON GOVERNMENT'S REQUEST FOR TRANSFER OF JUVENILE TO ADULT STATUS

DELGADO–COLON, United States Magistrate Judge.

### I. Background of the Case and Nature of the Charges Filed

On August 25, 1994, a complaint charging violation of 18 U.S.C. § 2119 (aiding and abetting in taking by means of violence and use of a firearm a motor vehicle shipped and transported in interstate commerce) was filed against C.J.T.G., a juvenile.[1] In the affidavit submitted and attached to the complaint, it is also alleged that the victim of the carjacking, Abner Polanco–Alicea, was shot and subsequently died as a direct result and consequences of the wounds caused by the four assailants (Docket # 2). On September 1, 1994, an information charging the offense previously described and a violation to 18

---

1. It is alleged that the juvenile was aiding and abetting three adults, namely: Miguel Angel Collazo, Luis Rodríguez and David García–Beltrán, who were separately charged for the same offense.

U.S.C. § 5032 (possession of a firearm during the commission of a crime of violence) was filed.

A certification from state authorities regarding the absence of a delinquent record against C.J.T.G. was obtained from the Bayamón Superior Court on August 30, 1994. *See* 18 U.S.C. § 5032.

A detention hearing was conducted pursuant to the provisions of 18 U.S.C. § 5035 (Docket # 13). Aware of the government's intentions to request the juvenile's transfer to adult status, the U.S. Pretrial Services was instructed to conduct a field investigation concerning the juvenile's neighborhood, personal and family background. In compliance with this Magistrate Judge's order, a report was filed on September 9, 1994. (Docket # 36). The parties agreed to have the juvenile herein evaluated by a certified clinical and forensic psychologist: Carol Romey, Ph.D.[2] On September 10, 1994, the Psychodiagnostic Evaluation Report was filed and made part of the record (Docket # 38).

As required under 18 U.S.C. § 5032, the U.S. Attorney certified that the offense charged is a crime of violence, the prosecution of which the federal government claims to have a substantial interest. On September 14, 1994, the government filed a Motion and Brief in Support of Transfer of Juvenile to Adult Status (Docket # 40). The government's request is based on the violent nature of the offense committed which resulted in a victim's death. In the government's motion, the legal reasoning and discussion of the criteria to be considered by the Court at the Transfer Hearing presents the factual scenario surrounding and following the commission of the offense charged. In citing *United States v. Doe*, 871 F.2d 1248 (5th Cir.1989), *cert. denied*, 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989); *United States v. Porter*, 831 F.2d 760 (8th Cir.1987); *United States v. Hemmer*, 729 F.2d 10 (1st Cir.1984), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2666, 81

L.Ed.2d 371 (1984); *United States v. Hayes*, 590 F.2d 309 (9th Cir.1979), the government argues that although the transfer hearing and decision is to be determined in accordance with "the best interests of justice", (*see: United States v. Hemmer*, supra, at 18) the courts, when confronted with a serious offense and aggravating circumstances, may consider that this factor alone could be given more weight than the other five (5) factors enumerated in 18 U.S.C. § 5032.

## II. Transfer Criteria for Criminal Prosecution

Title 18, U.S.C., Section 5032, specifically provides that:

> A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against [as a juvenile] ... unless he has requested in writing upon advice of counsel to be proceeded against as an adult, except that, with respect to a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony, that is, a crime of violence [ ... ], criminal prosecution on the basis of the alleged act may begin by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after a hearing, such transfer would be **in the interests of justice.** (Emphasis added).

In addition, § 5032 directs federal judicial officers to consider six (6) factors relating to the juvenile and the nature of the offense charged in the process of deciding the issue of a juvenile's transfer to adult status. These six (6) criteria are:

(a) the age and social background of the juvenile;

(b) the nature of the alleged offense;

(c) the extent and nature of the juvenile's delinquency record;

---

**2.** Dr. Romey's professional qualifications were stipulated by the parties at the evidentiary hearing. However, it is noted that she has been qualified as an expert and has served as a witness in prior similar proceedings in state and federal courts. At the present time, as a member of the Monitor's Office in Puerto Rico she has visited, inspected and is acquainted with all penal institutions and programs on the island either for both juveniles and adults. Dr. Romey's Curriculum Vitae was filed and made part of the record (Docket # 35).

(d) the juvenile's present intellectual development and psychological maturity;

(e) nature of past treatment efforts and the juvenile's response to such efforts; and

(f) the availability of programs designed to treat the juvenile's behavioral problems.

In the absence of explicit statutory language assigning the weight to be given to each and all factors previously enumerated, the guiding principle in transfer proceedings is whether the alleged delinquent's transfer would be in the interests of justice. *See* 18 U.S.C. § 5032; *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir.1984). A judicial officer is required to enter findings regarding each factor and we now analyze all six (6) factors as they relate to this case.

## A. Age and Social Background of the Juvenile

The juvenile was born on September 5, 1977, this means that C.J.T.G. turned seventeen years of age on the date he was submitted to the psychological evaluation conducted in regards to these proceedings. He is the second of five children, and at the present time lives with his mother and brothers. The juvenile's father's whereabouts have remained unknown for the past two years and it appears that little or no contact is kept by him with other family members. However, it seems that C.J.T.G. has always resided in the neighborhood of Naranjito, Puerto Rico, surrounded by his mother, sisters, and brothers. Reportedly, the juvenile's grandparents, uncle, two aunts, and several cousins live either with his family or within walking distance of his residence. The information gathered and verified by the U.S. Pretrial Services verifies that all family members are supportive of this juvenile, are willing to post bail on his behalf, and act as his custodians. The fact that this juvenile has a supportive family unit is additionally corroborated by their continuous attendance at court proceedings and willingness to testify on his behalf.[3]

It appears that no other immediate family member has ever had any brushes with the judicial system inasmuch as the record is void of evidence to the contrary.

C.J.T.G. was thirteen years old when he dropped out school after failing the sixth grade. At the juvenile's initial appearance the U.S. Pretrial Services provided information concerning the existence of learning disabilities. This information was then conveyed to the attorneys for the parties herein. (*See* Detention Order, Docket # 13).

Through the testimony of Nilda Guzmán, one of juvenile's aunts, it was disclosed that the juvenile, although raised in a family environment of limited economic resources, has always shared the love and support of family members. Mrs. Guzmán, who also resides at the juvenile's house, described their relationship as that of "mother and son" and described C.J.T.G. as a healthy boy, with a nonviolent, quiet and calm character, who has always obeyed and followed her advice. She further stated that the juvenile is a family-oriented person, with very few friends, who has displayed a good relationship with all family members, especially with his brother, also a teenager, with whom he never quarrels and shares things, clothing inclusive. It was her testimony that for quite some time the juvenile has been working with his uncle doing construction work. Regarding the juvenile's daily activities, it was stated that after work, once back at home, he "takes a bath, has supper and goes to bed", or he plays dominoes or watches television.

Mrs. Guzmán acknowledged knowing one of the adult defendants[4] related to this case as this individual is the son of a policeman that lives nearby. Although Mrs. Guzmán has heard allegations that C.J.T.G. was found in the possession of ten (10) decks of marihuana when arrested, she expressed she has never seen the juvenile smoking or ever suspected he used drugs. All other family members interviewed by the U.S. Pretrial Officer did not believe that C.J.T.G. used

---

3. The juvenile's mother, brothers, sisters and aunts have attended all proceedings before this Magistrate Judge, specifically the detention and transfer hearings.

4. Mrs. Guzmán was referring to defendant Miguel Angel Collazo. She further denied knowing the two other adult defendants.

illegal drugs.[5] (*See* U.S. Pretrial Services' Motion, Docket # 36).

According to Mrs. Guzmán, on the night the offense was committed, the juvenile was staying at his aunt's (Gladys Guzmán's) house in Toa Alta.

Mr. Rafael Gelpí, U.S. Pretrial Officer, through his investigation and testimony in court, corroborated the information provided by Mrs. Guzmán and the fact that this juvenile has been employed for the past two years with his uncle doing construction work. He further stated that the juvenile's mother believes that her son had been "trapped into this". Furthermore, that all family members get along fine within the home setting and have received no adverse information concerning the juvenile's relationship with other family members. Aside from Vallez's statements regarding the juvenile's use of drugs, Mr. Gelpí received no other information corroborating the juvenile's use of drugs.

### B. Nature of the Alleged Offense

At the hearing, F.B.I. Special Agent Miguel Alba confirmed the general factual details of the offense charged against this juvenile for having aided and abetted three (3) other adult individuals in a carjacking where the bodily injuries caused to the victim resulted in the victim's death. (*See:* Affidavit attached to the complaint and pages 8–10 of the Government's Motion to Transfer).

The crucial aspect of Agent Alba's testimony was the clarification he offered concerning the identification of the assailant provided by the victim, Abner Polanco–Alicea, to the state police agents after he was shot, although alive and awaiting for an ambulance to arrive.

According to Agent Alba, upon the state agents arrival to assist the victim, Polanco–Alicea was able to identify three (3) of his assailants by name. The victim specifically stated to Sergeant Germán Rivera and police officer Lorenzo Alicea that an individual known as "Cule,[6] El Gacho", kidnapped him in the vicinity of Toa Alta, having drove him to the road where he was found, took him out of his car, stripped him of his jewelry and shirt and finally shot him. The victim further stated that "Cule" was accompanied by two (2) other individuals known to him as Falito (Luis Rodríguez) and "the son of Collazo the policeman" (Miguel Angel Collazo). As to the fourth individual, the victim did not provide a name or a physical description, the victim's statement was to the effect that he just knew the fourth individual "by sight".

The adult defendants and the juvenile were initially seen by the state police agents approximately an hour after the commission of the offense. In the first car that was stopped, the same car described by the victim as the one belonging to the assailants, defendant Luis Fernando Rodríguez occupied the driver's seat, defendant Miguel A. Collazo, that of the passenger's side, and C.J.T.G., the juvenile herein, in the rear seat. Later on, the victim's burgundy Toyota Tercel was found and the fourth defendant was arrested. All stereo and electronic radio equipment removed from the victim's car and his sport jacket were found in the beige color with black fender Toyota Corolla in which the first three (3) individuals were found and arrested.

No fingerprints were found on the victim's car (Toyota Tercel). Those retrieved from the Toyota Corolla are still being examined. Accordingly, at the present time, no other evidence than the one depicted exists to identify C.J.T.G. as the individual accompanying the three (3) adults.

The information contained in the criminal complaint is adopted by reference as to all remaining details concerning the offense.

### C. Juvenile's Prior Delinquency Record

C.J.T.G. has no prior criminal delinquency record. This fact was verified by the U.S. Pretrial Services who conducted the investi-

---

**5.** It should be noted however, that while being telephonically interviewed on August 25, 1994, María Vallez, a cousin of this juvenile, expressed that the juvenile had admitted to her the occasional use of drugs while going out to dancing parties. Apparently, such use had been discontinued six months prior to the juvenile's arrest.

**6.** "Cule" has been identified as David García–Beltrán.

gation and was also certified by the Bayamón Superior (Juvenile's) Courts.

### D. Nature of Past Treatment Efforts and the Juvenile's Response to Such Efforts.

All evidence available shows that C.J.T.G. has not received mental health treatment nor has ever been referred to special educations programs or institutions. There is no history of past mental treatment.

### E. Juvenile's Intellectual Development and Psychological Maturity

At the parties request, a psychological evaluation of the juvenile was conducted on September 5, 1994. Five days later, Carol Romey, Ph.D., Clinical Psychologist, submitted a written psychodiagnostic evaluation report wherein it was concluded that "C.J.T.G. does not fulfill the clinical criteria that would warrant a transfer to the adult judicial system and that his (the juvenile's) educational deficiencies can be best attended within the juvenile justice system" (*see* Page 11, Evaluation Report, Docket # 38).

In her report and through her testimony Dr. Romey explained her conclusion to the effect that the juvenile although not fulfilling the diagnostic criteria for a diagnosis of mental retardation, actually performs at a mentally deficient range and that his overall performance equates the functioning level of a 7 to 8 year old child. According to Dr. Romey, C.J.T.G. appears to be functioning at a minimal intellectual and social level and to possess an unsophisticated and immature inner world.

Dr. Romey further recognized the juvenile's good reading and writing abilities, which do not correspond to the results or scores obtained from the different tests administered. These results, she explained, could be attributed to his limited educational background and family environment as a whole, in addition to the limited opportunities he has been exposed to due to his family's poverty. However, no evidence of malingering or willful intention to mischief were detected although the possibilities were considered and examined. Throughout her testimony Dr. Romey consistently and emphatically described the juvenile's continuous efforts to complete the tasks assigned and described how after hours of fruitless attempts to complete said tasks in a timely fashion, frustrated and under adverse conditions, he never exhibited the usual traits that violent persons and those with anti-social traits exhibit. Based on her past experience in similar cases, the tests given to the juvenile and her clinical observations she concluded that:

a) C.J.T.G. is performing within a deficient range when compared to his normative age group;

b) although not mentally retarded, he uniformly scored in the lowest percentile in terms of how much information he processes from his surroundings and what he perceives;

c) that there is no evidence of neurological deficit, motor coordination deficiency nor anti-social behavioral patterns;

d) the available data suggests a poor education, a child who has very little command of language, who exhibits great difficulties in processing, originating and expressing ideas, process that will usually take him three times the needed time;

e) C.J.T.G. is mentally competent to understand the proceedings against him and reasonably assist his lawyer. He appears to be well oriented, to be able to focus on tasks but easily loses concentration over time. While admitting having discussed the factual scenario of the case with the juvenile, Dr. Romey indicated that the juvenile's statements were "descriptive" but not "analytical".

f) the juvenile seems to live in a sheltered family environment where he fulfills their expectations, but the same as described, is a very simple, day-to-day life that is mostly non-verbal, where he has limited capacity for social interaction because of language deficits. According to Dr. Romey's statements this juvenile exhibits all the characteristics that a good candidate for rehabilitation should exhibit. It was her statement that "this juvenile has the potential, is the kind of case you look for to try the theory of rehabilitation." Throughout her evaluation, she

looked for indicators that would enable her to determine whether C.J.T.G. would constitute a danger to himself, to the community, to the existence of depressions or personality disorders. No such adverse indicators were found. No indicators of disorganization, impulsiveness, irritability, or propensity for violence were found. The juvenile at all times reacted in a cooperative, quiet and industrious attitude. Dr. Romey testified that the juvenile worked in an atypical (slow but steady pace) way for problematic juvenile's who are usually more demanding.

While being cross-examined she discarded the existence of neurological or brain damage resulting from possible use of drugs. She testified that usually the use of cocaine or crack is detected through the coordination tests. In this case, she considered that were the juvenile using drugs, its consumption had not been enough to cause a neurological impact on his verbal or neurological functioning. The attitude of looking for the easiest way out from difficult situations, so characteristic to drug addicts, was not detected in C.J.T.G.

When asked if she could explain or make an inference as to the juvenile's susceptibility to peer pressure, Dr. Romey clarified that due to the juvenile's mentally deficient performance, he will always be considered a marginal person in his age group, that he would most probably be left behind by those of his chronological age and will feel more comfortable with those between 13 or 14 years of age. She considered that although at times the juvenile looked shut-down and distant ("ido"), that did not affect his capacity for empathy. It was considered that the juvenile was concerned about the outcome of the criminal proceedings, but that his attitude was a way of coping with a situation unknown to him. Furthermore, she mentioned that contrary to what happens to cold and unresponsive children, this juvenile had triggered emotional links with his family members.

When asked to explain her conclusion that the juvenile's less effective scanning process created "a potential for faulty meditation and can contribute to less effective coping styles and behaviors", it was explained that in the general way in which we all perceive our surroundings, C.J.T.G. would miss noticing major things and that while trying to assemble all things, assigning priorities and importance, he would be lacking essential cues of information that would seriously affect his decision-making process. These, she considered could be dealt with through placing C.J.T.G. in educational programs, in which he had good possibilities of succeeding.

Lastly, it was concluded that the juvenile's:

a) cognitive areas of socially acquired information and awareness of socially appropriate norms and behavioral patterns (Verbal Comprehension Factor Score) were those expected of a 7–8 year-old child;

b) ability to grasp the essential aspects of a visual design and distinguish essential from nonessential aspects (Perceptual Organization Factor Score) is that comparable a 9–year–old child;

c) capacity to maintain focused on a task at hand, ability for concentration and his auditory memory skills were those comparable to a 13–year–old child.

## F. Availability of Programs Designed to Treat the Juvenile's Behavioral Problems

The psychological report confirms that from the available information there is no evidence of mental retardation. However, the juvenile's mental capacity and functioning level fall within the "mentally deficient" range. It is considered that the type of difficulties manifested by C.J.T.G. are customarily dealt with in remedial educational settings.

No evidence of anti-social behavioral patterns were shown. There is no past history of delinquent record or criminal behavior.

At the hearing the government presented the testimony of the Pretrial Services Officer who asserted the unavailability of state penal institutions that could afford rehabilitative treatment to minors. Although he admitted one possible available treatment program, that being Hogares Crea of Puerto Rico, a private non-penal institution.

The defense, through the testimony of Dr. Romey, who has worked for the Department of Social Services, the Administration of Juvenile Justice, Legal Aid Services and with the Court Monitor in the *Morales–Feliciano* case, and who has inspected all juvenile and adult institutions on the Island, testified as to the existence of minimum custody programs for juveniles with academic problems.

Dr. Romey specifically referred to one of the programs identified in Defendant's Opposition to Government's Request to Transfer (Docket # 42), and a program in Guaynabo, which has sheltered juveniles under the Juvenile and Adult Courts dual jurisdiction. Regarding the Proyecto Especial Para Adolescentes de Hogares Crea, it was mentioned that it focuses on educational programs and is not guided by the traditionally known CREA's conceptualization. This program is apparently funded and directed by the Administration of Juveniles Justice.

The defense in its Motion mentions two other non-penal institutions that focus on the minor's education until attaining high school and provide them with vocational training: Hogares Albergue Para Menores and Cuerpo de Voluntarios al Servicio de Puerto Rico.

### G. Other Information

At the hearing, with the purpose of being able to better assess the juvenile's demeanor and emotional state and compare it to the expert's description of the same, without any objection from the attorneys for the parties and in their presence, this Magistrate Judge personally addressed the juvenile in the Spanish language regarding his family relationship, how he felt while incarcerated, the persons he had met at the Detention Center and what, if anything, had he learned from them, his daily activities and his job. The Assistant U.S. Attorney, Antonio Bazán, also directed questions to the juvenile regarding his daily activities and work. 18 U.S.C. § 5032.

In general terms, as described by Dr. Romey, the juvenile impressed this Magistrate Judge as an introverted individual who expressed himself by facial expressions, monosyllables and short sentences. He described his family relationship as a good one, said he missed his family and was visited by them all during the previous weekend. C.J.T.G. provided information concerning his job, said he used to belong to a baseball team but that all other friends and team members had moved to the mainland, that at the present time he does not have too many friends and spends most of his time at home. He stated that whenever he attended parties it was accompanied by his elder brother who has a musical group/band whom he occasionally helped by playing the "tamboras." When asked if he played with the musical group to make some extra money he responded by asking with a rather surprisingly expression: "¿Cómo le voy a cobrar a mi hermano?" Curiously enough, he narrated having getting to know another juvenile at the institution and when asked to compare himself with that other individual he limited himself to stating that he felt they were different, that he was "a better person" and that when he thought of the idea of being in jail for years he felt "sad" and "wanted to cry."

Throughout this short period of questioning, and while sitting in court, the juvenile appeared interested in the proceedings, hardly moved, reacted in a shy but respectful manner, and provided articulated but very simple responses utilizing equally simple verbal expressions and words.

### III. Conclusion

C.J.T.G. is being accused for aiding and abetting in the commission of a violent crime in which the victim was shot and subsequently died. The evidence presented against this juvenile reflects that 45 minutes or an hour after the shooting of the victim, he was arrested while as a passenger in a car driven by two (2) of the adult codefendants. Even though the victim specifically described the three (3) adult individuals by their names, the name nor the physical description of the fourth individual (presumably the juvenile) could be provided by the victim whom only knew him "by sight." The victim clearly identified the triggerman as the man who was later arrested driving the victim's vehicle: David García–Beltrán. Assuming the juvenile's participation in the offense charged, the juvenile's role is more limited

than that of the other defendants. *See United States v. Welch*, 15 F.3d 1202, 1208 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994). Furthermore, there is no record of prior delinquency and/or anti-social behavior.

The offense was committed after the juvenile's sixteenth birthday and is a crime of violence. *See Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); *United States v. Baker*, 10 F.3d 1374 (9th Cir.1993) (to determine what constitutes a crime of violence, the court should look to the statutory violation and not at the juvenile's conduct). However, absent a prior conviction for a similar violent offense or a violation to the Controlled Substances Act, the juvenile's transfer to adult status is not mandated by law. (*See* 18 U.S.C. § 5032).

Although the seriousness of the crime involved may outweigh the other five (5) criteria enumerated under § 5032 (*Hemmer*, at 18), this case is distinguishable from those cited by the government. *See United States v. Hayes*, 590 F.2d 309 (9th Cir.1979) (where a juvenile charged with robbery was a petty officer in the Navy with intellectual development well above average); *United States v. H.M.M.S.*, 838 F.Supp. 30 (D.P.R.1993) (wherein the defendant was charged with a carjacking which resulted in the victim's death, although having no prior record, he was of average intelligence, and had wrestled the victim prior to him being shot); *United States v. Doe,* supra (where the juvenile charged with armed robbery had a prior record, was diagnosed with intellectual or behavioral problems and fragile possibilities of rehabilitation); *United States v. Porter,* supra, (where the juvenile was considered a dangerous special offender and had an extensive violence and utter disregard for the law).

C.J.T.G. portrays himself and mentally performs as a juvenile below his chronological age. He seems to have a supportive family and has always lived with his mother, aunt, brother and sister. Other family members, such as his uncle, who is also his employer, and grandparents also live nearby. The family relationship appears to be stable. Furthermore, Dr. Romey believes that C.J.T.G.'s ties to his mother and family are intact and will serve as an incentive and positive influence on him and that he will attempt to fulfill their expectations.

Furthermore, it is the expert's testimony and conclusion that C.J.T.G. does not constitute a risk to himself nor the community, that he exhibits no signs of disorganization, irritability, aggressiveness or anti-social behavior. It is considered that although chronologically 17 years of age, he is actually performing at a mentally deficient category comparable to that of the intellectual level of a 7 to 8 year-old child. The clinical psychologist considers that this juvenile presents an excellent profile for rehabilitation and is in need of remedial educational settings. *United States v. Doe,* 871 F.2d 1248 (5th Cir. 1989), *cert. denied* 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989) (finding that the potential for rehabilitation is a test within the sound discretion of the court); *United States v. Alexander*, 695 F.2d 398 (9th Cir.1982) (stating that there should exist a possibility—more than a glimpse of hope—of rehabilitation); *United States v. B.N.S.*, 557 F.Supp. 351 (D.Wyo.1983) (denied transfer of juvenile charged with first degree murder inasmuch as the juvenile's potential for rehabilitation was good and the existence of facilities in order to realize that potential were available did not make transfer to be "in the interests of justice").

When individually considered, the analysis of the evidence presented and the final conclusion regarding the juvenile's age and social background of the juvenile, the non-existence of prior delinquency record, the juvenile's present and intellectual development and psychological maturity, favors the conclusion that this juvenile should continue being legally treated as such. Although there are no penal state institutions that could provide psychiatric or drug treatment rehabilitation programs, C.J.T.G. does not appear to be in need of mental or a structured drug rehabilitation program. Furthermore, it appears that there are a few non-penal institutions, that are either funded by or assist the Juvenile Court in providing academic assistance to juvenile, from which C.J.T.G. may benefit.

It should be noted that the purpose of Juvenile Delinquency Act is "to be helpful and rehabilitative rather than punitive, and to reduce, at least to some extent, the stigma of criminal conviction." *United States v. Hill,* 538 F.2d 1072 (4th Cir.1976); *In re J. Anthony,* 690 F.Supp. 760 (S.D.Ind.1988). Similarly, to the factual scenario in this case, in *United States v. Doe,* 710 F.Supp. 958 (S.D.N.Y.1989), due to the fact that the juvenile had no prior criminal record and the psychiatric evaluation denoted the minor's lack of maturity, the Court considered he had possibilities of rehabilitation. In this case the psychologist's assessment is that C.J.T.G. has very good rehabilitation possibilities. Even in cases where a juvenile was charged with murder, as in *United States v. Dennison,* 652 F.Supp. 211 (D.N.M.1986), because the juvenile was a good student, was of average intelligence, and rehabilitation programs were available, the Court refused to transfer the minor to adult status in spite of a prior record. *See also In re T.W.,* 652 F.Supp. 1440 (E.D.Wis.1987) (wherein transfer was denied upon evidence being presented regarding the minor's redeeming qualities, the fact that no prior treatment had been received and rehabilitation facilities existed).

Being there no history of an anti-social, violent or delinquent behavioral pattern, considering that the juvenile is performing at a mentally deficient range significantly below that expected from someone his chronological age, and that his prognosis for rehabilitation seems to be excellent, it is considered that the balancing of the factors described in 18 U.S.C. § 5032 show that the interests of justice will be served by having C.J.T.G. treated as juvenile offender.

In accordance with Rule 510.2(A), Local Rules, District of Puerto Rico, any objections to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *Borden v. Secretary of Health and Human Services,* 836 F.2d 4, 6 (1st Cir.1987) (per curiam). The objections must be in writing and "shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the legal basis for such objections." Rule 510.2, Local Rules, District of Puerto Rico.

IT IS SO RECOMMENDED.