**UNITED STATES of America, Plaintiff**

**v.**

**R.I.M.A., Defendant.**

**Criminal No. 96–233(CCC).**

United States District Court,
D. Puerto Rico.

Feb. 7, 1997.

Mark Irish, Assistant U.S. Attorney, San Juan, PR, for plaintiff.

Juan E. Alvarez, Assistant Public Defender, San Juan, PR, for defendant.

### ORDER

CEREZO, Chief Judge.

Having considered the Motion to Transfer Juvenile Defendant to Adult Status filed by

the government on August 21, 1996 (**docket entry 18**), the supplemental Motion to Transfer Juvenile Defendant to Adult Status filed by the government on August 27, 1996 (**docket entry 23**), Defendant's Opposition to the Government's Request (**docket entry 37**), and the Magistrate Judge's Report and Recommendation (**docket entry 38**), to which no objections have been filed, as well as the applicable law and jurisprudence, the Magistrate Judge's Report and Recommendation is APPROVED and ADOPTED. Accordingly, the Motion to Transfer Juvenile Defendant to Adult Status (**docket entry 18**) is hereby GRANTED.

SO ORDERED.

## MAGISTRATE-JUDGE'S REPORT AND RECOMMENDATION ON GOVERNMENT'S REQUEST FOR TRANSFER OF JUVENILE TO ADULT STATUS

DELGADO-COLON, United States Magistrate Judge.

### I. Background of the Case and Nature of Charges Filed

On August 8, 1996, a complaint charging violations to 18 U.S.C. §§ 2113(a) and (d) and 924(c)(1) was filed against R.I.M.A., a juvenile. The complaint specifically charges R.I.M.A. for having aided and abetted with three (3) other persons, all adults, in a bank robbery and the illegal possession of a weapon during the commission of a violent offense. In the affidavit attached to the complaint, Federal Bureau of Investigation Special Agent Ricardo García (S/A García) narrates how on August 7, 1996, several individuals, the juvenile among them, while heavily armed and wearing ski masks entered the R-G Premier Bank of Puerto Rico, a federally insured institution, and while threatening and intimidating bank employees and customers did attempt to rob the bank. It is further described how these individuals, while being detected by the bank security guard and members of the Puerto Rico Police Department, engaged in a shoot-out that resulted in serious bodily injuries to José Luis García, the bank security guard. While attempting to escape apprehension, one of the assailants committed a carjacking against a customer at the bank's drive-in window. Subsequently, that same date, and as a result of the surveillance by the Puerto Rico Police Department as supported by the FURA aerial unit, the adults and R.I.M.A. were arrested (**Docket No. 1**).

A certification from state authorities regarding the absence of a delinquent record against R.I.M.A. was obtained from the San Juan Superior Court on August 16, 1996. *See,* 18 U.S.C. § 1032 and **Docket No. 12**.

A detention hearing was conducted pursuant to the provisions of 18 U.S.C. § 5035 (**Docket No. 6**). Aware of the government's intentions to request the juvenile's transfer to adult status, the U.S. Pretrial Services was instructed to conduct a field investigation concerning the juvenile's neighborhood, personal and family background. In compliance with this Magistrate–Judge's Order, the U.S. Pretrial Service Office filed its report on August 16, 1996 (**Docket No 10**). Thereafter, the juvenile was evaluated by a certified Clinical and Forensic Psychologist, Dr. Carol M. Romey (Dr. Romey) (See Dr. Romey's report attached to **Docket No. 32**).[1]

As required under 18 U.S.C. § 5032, the U.S. Attorney certified that the offense charged is a crime of violence, in the prosecution of which the federal government has a substantial interest (**Docket No. 21**). On August 21, 1996, the government filed a Motion to Transfer to Adult Status (**Docket No. 18**). The government's request is based on the violent and premeditated nature of the offenses charged which resulted in serious bodily injuries to a bank security guard, a shoot-out at a public parking lot and the commission of a carjacking (**Docket No. 21**). The strength of the government's request lies in the facts and/or incidents surrounding

---

1. During the transfer hearing, the professional qualifications of Dr. Romey were stipulated by the parties. It is noted that Dr. Romey has been previously qualified in Court as an expert in clinical and forensic psychology. Dr. Romey has had ample experience in dealing with juveniles and has served as expert for the Juvenile State Court and also in this Court. As a member of the Prison Monitor's Office in Puerto Rico, she has visited, inspected and is acquainted with all penal institutions and institutional programs on the island for both juveniles and adults.

the commission of the offenses which included abduction of a bank employee while seeking to identify the bank manager and display and use of long barreled weapons.

On August 27, 1996, the government filed a four-count Superseding Information. In Count I, R.I.M.A. is being charged for a carjacking offense committed on August 5, 1996, wherein by force, intimidation and violence and while using a weapon, R.I.M.A. took a Ford Explorer from Elga García (18 U.S.C. § 2119). The government's evidence indicates this is the same vehicle utilized two days later in the commission of another crime. Count II charges the illegal use and possession of a handgun in the commission of a carjacking as charged in Count I. Count Ill charges the bank robbery violation (18 U.S.C. § 2113(a) and (d)). Count IV charges a violation to 18 U.S.C. § 924(c)(1),(3) for the carrying and use of firearms (a .357 caliber revolver, a .30 caliber assault rifle and one shotgun) during the commission of a crime of violence, specifically the bank robbery charged in Count III. (**Docket No. 21**)

## II. Transfer Criteria for Criminal Prosecution

Title 18 U.S.C. § 5032 specifically provides that:

A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against [as a juvenile] ... unless he has requested in writing upon advice of counsel to be proceeded against as an adult, except that, with respect to a juvenile fifteen years and older alleged to have committed an act after this fifteenth birthday which if committed by an adult would be a felony, that is, a crime of violence [ ... ], criminal prosecution on the basis of the alleged act may begin by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after a hearing, such transfer would be in the best interest of justice. (Emphasis added.)

In addition, § 5032 directs federal judicial officers to consider six (6) factors relating to the juvenile and the nature of the offense charged in the process of deciding the issue of a juvenile's transfer to adult status. These six (6) criteria are:

1. the age and social background of the juvenile;

2. the extent and nature of the juvenile's delinquency record;

3. the nature of past treatment efforts and the juvenile's response to such efforts;

4. the juvenile's present intellectual development and psychological maturity;

5. the availability of programs designed to treat the juvenile's behavioral problems; and

6. the nature of the alleged offense.

At the transfer/evidentiary hearing, the judicial officer is required to assume the validity of the criminal charges filed. In the absence of explicit statutory language assessing the weight to be given to each and all factors previously enumerated, the guiding principle in transfer proceedings is whether the alleged delinquent's transfer would be in the best interest of justice. *See,* 18 U.S.C. § 5032; *United States v. Hemmer,* 729 F.2d 10, 18 (1st Cir.1984).

## III. The Evidentiary/Transfer Hearing

At the transfer hearing the government presented the testimonies of Homero Sanin, Federal Bureau of Investigation Agent (Agent Sanin), and Rafael Gelpí, U.S. Pretrial Service Officer (USPT Gelpí). The defense presented the testimonies of Dr. Romey, Mr. Edwin Colón (Mr. Colón), a retired Puerto Rico Police Officer, and Mrs. Lida Andino (Mrs. Andino), the juvenile's mother.

Based on the evidence presented, the findings as to each of the six areas that must be addressed, pursuant to 18 U.S.C. § 5032, are as follows:

### A. Age and Social Background of R.I.M.A.

R.I.M.A. was born on May 10, 1979, which means that this juvenile was almost seventeen-and-a-half-years-old at the time of the

offense.[2] He is the second of two children, and at the time of arrest was living with his brother, grandmother and mother, who has been a nurse since 1969. It appears that R.I.M.A. and family members have always resided in the neighborhood of Toa Baja, Puerto Rico, in what has been described by the U.S. Pretrial Officer as a stable home environment in which this juvenile has benefited from a supportive family. The juvenile's mother appears to be a good and responsible parent who is genuinely respected by R.I.M.A. and who has always looked after her children's needs.[3] The juvenile resided in a clean and humble home environment where all his basic needs were fulfilled in accordance with family financial means (**Docket No. 10**).

The fact that this juvenile has a supportive family unit is further corroborated by their continuous appearance in Court and their willingness to testify on his behalf.

It appears that no other immediate family member has ever had any brushes with the judicial system inasmuch as the record is void of evidence to the contrary.

Through the testimony of the juvenile's mother and Mr. Colón, a former police officer, the juvenile has been described as a quiet, humble, obedient and introverted youngster. It is the assessment of Dr. Romey, Psychologist, that the defendant is emotionally dependent on his mother whose approval and guidance he recognizes to be in need of. Furthermore, it is considered that in spite of the fact that R.I.M.A. has entered in a common-law relationship and is expecting a son, the juvenile has not completed the psychological transition to a "head of family household."

Dr. Romey further testified that R.I.M.A. is not impulsive, does not exhibit a high risk profile and exhibits depression traits caused by his present confinement. Though R.I.M.A. appeared to be "socially alienated," it is her opinion that this condition is prompt-

ed by the fact that R.I.M.A. has not adapted to prison life and recriminates himself.

R.I.M.A. used to excel in sports. Mr. Colón, who is also a community leader and has known R.I.M.A. since his early childhood, stated that R.I.M.A. was a good baseball player who always displayed a positive attitude and camaraderie with fellow players.

USPT Gelpí has verified that R.I.M.A.'s school records indicate that he completed the 9th grade and abandoned school during the second semester (1995–96) while attending the 10th grade. Throughout his 7th, 8th and 9th grades, R.I.M.A. had a general average of 2.17–2.25. Subsequently, R.I.M.A. took some courses in an attempt to complete high school through a general equivalency test. *See,* Exhibits 6 and 7.

R.I.M.A. denied the use of drugs. No mental or learning disabilities have been found. Physically, R.I.M.A. can be described as a well nourished and developed adolescent.

## B. Juvenile's Prior Delinquency Record

There is no record of prior delinquency adjudication or arrests.

## C. Nature of Past Treatment Efforts and the Juvenile's Response to Such Efforts

All evidence available indicates that R.I.M.A. has never received mental health or drug rehabilitation treatment. Although he failed and abandoned school while attending the tenth grade, R.I.M.A. was never referred to special educational or vocational programs or institutions.

## D. Juvenile's Intellectual Development and Psychological Maturity

On September 15 and 28, 1996, R.I.M.A. was evaluated by Dr. Romey. The tests administered to him were the Weschler In-

---

2. The offenses charged were committed on August 5 and 7, 1996, at a time when R.I.M.A. was nine (9) months short of attaining his eighteenth birthday.

3. Reportedly, the juvenile's father, with whom the juvenile had a good relationship, died in 1985 in a traffic accident. At the time, R.I.M.A. was six (6) years of age.

telligence Scale for Adults, EIWA;[4] Rorschach Psychodiagnostic Plates (RPP);[5] the Minnesota Multiphasic Personality Inventory—A, Hispanic Ed. (MMPI);[6] Draw-a-Person Test (DPT);[7] Rotter Incomplete Sentence Blanks (RISB);[8] and the Bender Gestalt Test (BGT).[9] (*See,* Dr. Romey's report, page 1.)

From Dr. Romey's clinical interview, she was able to gather and corroborate R.I.M.A.'s personal and family background. In sum, she determined that R.I.M.A. was the youngest of two brothers, has never been physically or psychologically abused, has no prior record and does not consume alcohol or drugs on a regular basis. During the eight-month period prior to his arrest, R.I.M.A. had entered into a common-law relationship and the couple is now expecting their first child.

The main psychological factors identified in R.I.M.A's personality were those of depression, anxiety, nervousness and tension. His general mood was seen as sad and upset with his present condition. During the intellectual part of the testing, he denoted interest, worked carefully and showed adequate tolerance for frustration. However, the personality phase of the testing was more difficult. R.I.M.A. was "unable/unwilling to reveal his inner feelings."

Dr. Romey concluded that R.I.M.A. has no neurological impairment, there is no indication of cerebral dysfunction and the tests results reveal adequate visual motor coordination abilities for an individual his age. (*See,* Dr. Romey's report, page 3.)

The psychologist's overall assessment is that R.I.M.A., at the present time, has no suicidal ideations, is able to concentrate, is alert, coherent, articulated, and displays a rather non-hostile attitude. He has a general verbal I.Q. score of "bright average" and scored at a "superior" level in the performance I.Q. and the full scale I.Q. as well. This places R.I.M.A. in the 90 percentile rank when compared to those in his normative age group: 16–19 years. His personality profile is within the expected behavioral and intellectual parameters.

His ability to conduct visual and logic organization as well as his ability to grasp the essential from the nonessential ranked at a superior level. R.I.M.A. has the capacity to remain focused (superior score) on the task at hand and is fully aware of the social appropriate norms and acceptable behavioral patterns. He is fully capable of foreseeing the consequences of his acts.

Undoubtedly, R.I.M.A. is an adolescent with no cognitive, mental or neurological impairment. He grew up in a stable family environment where the law and moral principles were obeyed. At the present time he appears to be in need of psychological intervention, but the type of assistance he needs can be obtained in both juvenile and adult institutions. (*See,* Dr. Romey's report, page 8.)

### E. Availability of Programs Designed to Treat the Juvenile's Behavioral Problems

The psychological reports confirm the fact that there is no evidence of mental retardation or neurological dysfunction. Rather than emotional problems and need for psychotherapy, R.I.M.A. exhibits more traits of having a coping problem. The juvenile's in-

4. This EIWA test looks at ten areas of intellectual functioning to determine the verbal and performance scales.

5. The RPP determines the individual's psychological profile and dynamics, that is, identifies the decision making process and the meaning that an individual attributes to his surroundings.

6. The MMPI consists of a series of exercises through which the individual reveals how he feels, his actual emotional condition and how he relates to his present circumstances.

7. When completing this test, the individual is asked to draw a human figure. This tends to indicate and be a reflection of self imaging.

8. In the RISB the individual is asked to complete thoughts or phrases with which he is presented. His answers are to be interpreted as indicators of the individual's strong concerns, elements that dominate his "thinking" process and how he relates to his present circumstances.

9. The BGT is considered a short test where the individual is shown several different designs and constitutes a brief neurological screening.

tellectual functioning has been determined between "Average" and "Above Average." R.I.M.A. has never received mental health treatment and has never experienced a condition warranting such referral.

Dr. Romey's opinion is that since R.I.M.A. is not drug dependent, residential treatment programs as those provided by CREA will have no effect on him. Still, she appeared to be in need of additional data prior to be able to determine whether R.I.M.A.'s family environment and minimal supervision was sufficient to satisfy R.I.M.A.'s need for guidance and structured supervision.[10]

No evidence of anti-social behavioral patterns were considered to exist. Dr. Romey testified that during interview sessions, R.I.M.A. was respectful, did not exhibit hostility, was not careless, or otherwise impulsive. R.I.M.A. is aware of what is socially acceptable and correct in terms of "cause and effect," and denotes poor contact with his inner feelings. (*See,* Dr. Romey's report, page 3.)

At the hearing, the parties did not present evidence regarding the availability of state programs designed to treat the juvenile's behavioral problems. However, in Defendant's Opposition to Government's Request to Transfer (Docket No. 37), the defense mentions programs such as "Cuerpo de Voluntarios al Servicio de Puerto Rico," "Proyecto Especial Para Adolescentes de Hogar Crea" and "Hogares Albergue Para Menores." In doing so, they fail to identify the admission criteria for such programs; whether R.I.M.A. will qualify; whether the juvenile's need for psychological treatment can be met; what type of security level, if any, does exist at such institutions; and how such institutions may impede a participant from abandoning the program. Nevertheless, it is well known in this jurisdiction that the availability of possible treatment centers, as the ones R.I.M.A. is in need of, are scarce.

Information submitted by counsel and/or gathered through prior similar proceedings and by the U.S. Pretrial Service Office, indicates that:

1. Private non-penal institutions, such as Hogares CREA of Puerto Rico, may only adequately provide drug rehabilitation treatment. R.I.M.A. is not in need of such treatment.

2. Through the Department of Social Services and the Commonwealth Administration of Juvenile Justice, and the Legal Aid Services, some minimum custody programs have been identified. These programs serve mainly juveniles with academic problems until they complete the 12th grade.

3. There is a private, non-institutional program in Guaynabo, which in the past has sheltered juveniles under the Juvenile and Adult Courts' dual jurisdiction. This program ("Proyecto Especial Para Adolescentes de Hogar CREA") focuses on educational programs and is not guided by the traditionally known CREA conceptualization. This program is apparently funded and directed by the Administration of Juvenile Services. No information was provided as to admission requirements and limitations, if any, to a juvenile's participation.

4. Two other non-penal institutions: "Hogares Albergue Para Menores" and "Cuerpo de Voluntarios al Servicio de Puerto Rico," focus on the minors' education until attaining the 12th grade and provide them with vocational training. However, participation at such programs is contingent to the availability of funds and space. There is no information as to whether the participants must attend on a voluntary basis or for how long an individual may participate (**Docket No. 37**).

5. "Cuerpo de Voluntarios al Servicio de Puerto Rico," a division of Job Corps, is designed to attend the needs of individuals between the ages of 16 and 28 and emphasizes in vocational trainings.

---

**10.** Essentially, Dr. Romey's opinion is that since R.I.M.A. has not benefited from prior treatment or supervision within the juvenile system, he should not be transferred to adult status but should be granted an opportunity to remain and adjust between those similarly situated, most probably found at institutions or programs for persons between 18 to 25 years of age.

In view of the scarce resources available, the fact that no additional evidence or information was presented regarding this factor; that no evidence has been presented in terms of the institutional requirements for admissions or assurances the programs may provide in order to deter or decrease any possible risk of danger that the juvenile may pose to the community; that there is no indication that R.I.M.A. has or might be interested in developing some skills; the fact that R.I.M.A., as per Dr. Romey's recommendation, should be referred for a more in depth psychological evaluation;[11] and in considering the violent nature of the offenses charged and potential risk of danger that R.I.M.A. may pose, it is considered that none of the above-mentioned programs, which are non-penal institutions, will satisfy the juvenile's needs.

### F. Nature of the Alleged Offense

At the evidentiary hearing Agent Sanin testified and confirmed the general factual details of the offenses charged against R.I.M.A.

The crucial aspect of Agent Sanin's testimony consists in the strength of the evidence gathered to establish the juvenile's identity, his active participation and leading role in the carjacking perpetrated on August 5, 1996, and the elements that indicate the premeditated nature of the juvenile's and co-defendants' acts of August 7, 1996.

The government's evidence establishes that on August 5, 1996, in Bayamón, Puerto Rico, Mrs. Elga García, while exiting her Ford Explorer vehicle, was approached by two individuals. One of the individuals, who she was later able to identify as R.I.M.A., was carrying a weapon, and while threatening to kill her, at gun point, demanded the keys to the vehicle. Mrs. García stated that the carkeys were already inside the house. R.I.M.A., still carrying his weapon, walked with Mrs. García into the house, took the keys, stole the vehicle and fled the scene. This same Ford Explorer was located two days later (Exhibit 1).

On August 7, 1996, at approximately 9:25 AM, the security guard at the R–G Premier Bank saw a Ford Explorer park at the institution's parking lot. Four individuals exited the vehicle. The front seat passenger entered the bank and while entering he pushed a bank customer, who was on his way out, back inside the bank. The other three individuals then entered the bank. The security guard saw that all four assailants were armed,[12] had ski masks and R.I.M.A., who has been identified as the driver of the Ford Explorer, was wearing a baseball cap.

Once inside the bank, one of the assailants threatened a bank employee, took the employee hostage and demanded the identification of the manager. Once the manager identified himself, he was threatened and told to open the vault. However a second combination or code only known by another bank employee was needed in order to open the bank's vault. Both employees were hit on several occasions until they finally entered the necessary codes to open the vault.

At the time, one of the assailants had gone into the vault and a second one remained standing nearby. One of them overheard gun shots[13] and gave notice to the fellow assailants. It was then, upon hearing gun shots outside the bank, when the Ford Explorer's driver (R.I.M.A.) exited the bank followed by his companions, who were shooting back at the police officers.[14] R.I.M.A. was the only one who managed to get into

---

11. In her report Dr. Romey determines that R.I.M.A. is in need of individual psychotherapy to address depressive reactions and in developing coping strategies. At the present time R.I.M.A. exhibits little interest in his immediate environment, utilizes rationalization and intellectualization as defensive reactions, tends to be very dissatisfied and feels uncomfortable in new social situations. (Dr. Romey's Report, pp. 5–6)

12. Three weapons were recovered by law enforcement officers. A "universal carbine assault rifle" carried by defendant Edgar Torres–Arroyo,

a "Rugger Revolver" .357 caliber carried by José González–Arroyo and a shot gun. (**Docket No. 1**; Exhibits 4 and 5, (Count III)).

13. It appears that upon being informed by Security Guard García, members of the Puerto Rico Police showed up at the premises.

14. Agent Sanin testified that he believes that while running away from the bank, R.I.M.A. did not respond by firing back to police agents.

the Ford Explorer and drove away. Two of the remaining three robbers, after a brief shoot-out with police officers, were arrested at the site. The third one, who ran towards the drive-in window teller, by means of violence and while using a weapon, stole a green Chevrolet Astro Van and managed to escape.

A police officer who had followed the Ford Explorer driven by R.I.M.A. found it abandoned. A FURA helicopter followed the green Chevrolet Van which had just been stolen at the R–G Premier Bank and spotted it in Toa Baja. Two individuals were observed running away from it while it was burning. The police kept searching and looking for the individuals who had escaped from the shoot-out at the bank and finally R.I.M.A. and another individual were arrested.

During the shoot-out, security guard García was wounded in his face and chest with pellets fired from the shotgun.

R.I.M.A., while escaping the bank premises, received a bullet wound in his right foot. A pair of sneakers, which are the same size as those worn by R.I.M.A., with a bullet hole in the right shoe, were recovered from the place/house where R.I.M.A. was arrested.

Subsequently, after being advised of his constitutional rights and while in the presence of his mother, R.I.M.A. admitted to his participation in the offenses charged.

From the above-stated set of events, the premeditated nature of the juvenile's actions and his co-participants is clear. On August 5, 1996, in what appears to have been done in preparation for the bank robbery, and while in the illegal possession of a weapon, by means of threat and violence, R.I.M.A. committed a carjacking. R.I.M.A. had an active role, being the primary actor.

Two days later, R.I.M.A. and his associates, having equipped themselves with ski-masks and weapons, entered a bank and without hesitation abducted bank employees. The shootout that ensued immediately thereafter was foreseeable as well as the injuries caused to the security guard.

## IV. Conclusion

■ It is not without deep concern and regret that on a daily basis members of our society, mainly youngsters, having received proper guidance, do elect to go astray. They depart from family moral values and teachings, abandon school, succumb to peer pressure, rapidly deteriorate and, occasionally, without visible signs of such deterioration, scale into acts of violence which places the community and their own physical integrity at danger.

R.I.M.A., at the time the offenses were committed, was nine (9) months short of attaining his adulthood. Although not psychologically or financially capable of being independent, he acted as if he were an adult of greater age and experience. However, the serious actions in which he engaged on August 5 and August 7, 1996, which carried great potential for serious injuries to other persons, do place R.I.MA. in a violent category far beyond his peers, and are far beyond the seriousness of other acts of juvenile delinquency that are being taken to the Juvenile Court on a daily basis.

The strength of the government's evidence, which includes the testimony of the victim of the carjacking occurred on August 5, 1996; R.I.M.A.'s admissions to the bank robbery of August 7, 1996; the undeniable corroboration of R.I.M.A.'s presence at the bank when the shootout ensued, as established by the injury in his foot; the evidence of flight and the testimony of those police officers who were either at the bank or conducted surveillance, is overwhelming.[15]

There is no indicia that R.I.M.A. could be disoriented as to time and space, unaware of the logical consequences of his acts or otherwise suffering from a mental defect or impairment or a neurological condition. To the

---

**15.** It is an undisputed fact that the offense was committed after the juvenile's sixteenth's birthday and the same constitutes a crime of violence. *See, Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); *United States v. Baker,* 10 F.3d 1374 (9th Cir.1993), *cert.* *denied,* 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994) (to determine what constitutes a crime of violence, the Court should look to the statutory violation and not at the juvenile's conduct).

contrary, through R.I.M.A.'s psychological evaluation, it has been determined that his intellectual functioning is that of "average" and "above average" remaining in the 90 percentile rank when compared to those in his normative age group. His personality profile is within the expected behavioral and intellectual parameters.

Which or what has been the triggering factor for R.I.M.A.'s violent conduct remains unknown. However, according to Dr. Romey, R.I.M.A. remains either unable or unwilling to reveal his inner feelings and has a behavioral and/or coping problem for which he needs treatment. Although R.I.M.A. reported having a good relationship with his family members, former co-players and neighbors, the changes in the juvenile's behavioral pattern and conduct constitute a cry for immediate corrective action and treatment. As per Dr. Romey's statement, such treatment may be provided at a juvenile or adult institutional facility. Within the Puerto Rico correctional system or at a non-penal private institution, the availability for such treatment is null.

■ It is noted that the psychologist in this case, although stating that there were no high risk indicators such as drug use, mental defect, or prior record of violent conduct, did not specifically make an assessment regarding the juvenile's profile and prognosis for rehabilitation. *United States v. Doe,* 871 F.2d 1248 (5th Cir.), *cert. denied,* 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989) (finding that the potential for rehabilitation is a test within the sound discretion of the court). Considering R.I.M.A.'s past conduct, his academic performance, his inability to express inner feelings, his dissatisfaction with himself and his surroundings, and the lack of state structured rehabilitation programs, it appears that, unless he receives adequate treatment, his potential for rehabilitation is guarded.[16]

This Magistrate–Judge recognizes that the purpose of the Juvenile Delinquency Act is "to be helpful and rehabilitative rather than punitive, and to reduce, at least to some

extent, the stigma of criminal conviction." *United States v. Brian N.,* 900 F.2d 218, 220 (10th Cir.1990); *United States v. Hill,* 538 F.2d 1072, 1074 (4th Cir.1976); *In Re J. Anthony,* 690 F.Supp. 760 (S.D.Ind.1988). However, the transfer of a juvenile to adult status is to be determined in accordance with "the best interests of justice." *United States v. Hemmer,* 729 F.2d 10, 18 (1st Cir.), *cert. denied sub nom. Randazza v. U.S.,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984). In making such a determination, "[the] district court must balance these purposes against the need to protect the public from violent and dangerous individuals." *United States v. Juvenile Male # 1,* 47 F.3d 68, 71 (2d Cir.1995).

■ Having considered all evidence presented and the six criteria enunciated under 18 U.S.C. § 5032, it is considered that the balancing of such factors favors the determination of the juvenile's transfer to adult status. What is more, given the seriousness of the offenses charged, the circumstances and manner in which the same were committed, and the juvenile's active role during the events of August 5 and 7, 1996, it is considered that the nature of the offense by itself makes transfer to adult status warranted. *See, U.S. v. One Juvenile Male,* 40 F.3d 841 (6th Cir.1994) (district court did not abuse its discretion in ordering transfer to adult status based on conclusion that heinous nature of crime outweighed other factors that supported trial as juvenile); *U.S. v. Doe,* 871 F.2d 1248 (5th Cir.), *cert. denied,* 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989) (when confronted with a serious offense and aggravating circumstances, the court may consider that this factor alone could outweigh the other five factors enumerated in 18 U.S.C. § 5032); *U.S. v. Hemmer,* 729 F.2d 10 (1st Cir.), *cert. denied sub nom. Randazza v. U.S.,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984) (in light of gravity of crime involved, weighed against other five factors, district court did not strike improper balance in ordering transfer to adult status).

---

16. In cases where the juvenile's potential for rehabilitation is good and facilities exist so as to allow the juvenile's potential to be realized, it is not in the interest of justice to transfer to adult status. *United States v. B.N.S.,* 557 F.Supp. 351 (D.Wy.1983).

Accordingly, it is **RECOMMENDED** that the government's Motion to Transfer Juvenile Defendant to Adult Status (**Docket No. 18**) be **GRANTED**. The Supplemental Motion to Transfer Juvenile Defendant to Adult Status (**Docket No. 23**) is **NOTED**.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 504.3 of the Local Rules of Court. Any objections to the same must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Rule 510.1, Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to timely file specific objections to the Report and Recommendation is a waiver of the right to review by the District Court. *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980). The parties are advised that review of a Magistrate–Judge's Report and Recommendation by a District Judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate–Judge. *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir.1988).

**IT IS SO RECOMMENDED.**