**UNITED STATES of America, Plaintiff,**

v.

**JUVENILE K.J.C., Defendant.**

No. 97–M–33–MWB.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Sept. 9, 1997.

**1220**

Richard L. Murphy, Asst. U.S. Atty., Cedar Rapids, IA, for Plaintiff.

Mark Brown, Cedar Rapid, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING MOTIONS TO TRANSFER JUVENILE TO ADULT STATUS

BENNETT, District Judge.

### TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND ................................... 1220

II.  LEGAL ANALYSIS ................................................ 1221
  A.  The Federal Juvenile Justice And Delinquency Prevention Act .......... 1221
  B.  The Act's Framework .......................................... 1222
  C.  Interest of Justice Determination ............................... 1223
  D.  Application Of The Section 5032 Factors To This Case ............... 1224
    1.  Age And Social Background .................................. 1224
    2.  Nature Of The Alleged Offense ............................. 1226
    3.  Prior Delinquency Record ................................. 1228
    4.  Intellectual Development And Psychological Maturity .............. 1228
    5.  Past Treatment Efforts ................................... 1229
    6.  The Availability of Programs For Treatment .................. 1230

III. CONCLUSION .................................................. 1232

Since the beginning of the nineteenth-century, social reformers have promoted the idea that the rehabilitation of juvenile delinquents can prevent them from becoming adult offenders. *See* Hon. Gordon A. Martin, Jr., *The Delinquent and the Juvenile Court: Is There Still a Place for Rehabilitation?* 25 CONN. L. REV. 57, 65–67 (1992) (providing review of the historical views of juvenile treatment in America). Reflecting this philosophy, Congress has attempted to protect juveniles in appropriate circumstances, balancing their prospects of rehabilitation against society's right to be free from crime. Here, the court is called upon to perform the statutory balancing test called for by the Federal Juvenile Justice And Delinquency Prevention Act, 18 U.S.C. § 5032, in order to determine whether the defendant, juvenile K.J.C., will continue to be treated as a juvenile or will be transferred for adult prosecution.

### I. INTRODUCTION AND BACKGROUND

Defendant juvenile K.J.C. is currently charged with the commission of three offenses: aiding and abetting a bank robbery; possessing LSD with intent to distribute; and aiding and abetting in the distribution of LSD.[1] On July 15, 1997 and August 19, 1997, the government filed motions to transfer the proceedings against K.J.C. to adult criminal prosecution pursuant to 18 U.S.C. § 5032.

---

1. K.J.C. is charged in two separate two-count criminal complaints filed on July 9, 1997, and August 19, 1997. In the July 9, 1997, information he is charged with aiding and abetting a bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d). K.J.C. is also charged with one count of conspiring to distribute and possess with intent to distribute lysergic acid diethylamide ("LSD"), conspiring to distribute and possess with intent to distribute LSD within 1000 feet of a public secondary school, and conspiring to use facilities in interstate commerce to facilitate the distribution of LSD, in violation of 21

U.S.C. §§ 841(a)(1), 843(b), 846, and 860(a). In the August 19, 1997, information, K.J.C. is charged with distributing and possessing with intent to distribute LSD within 1000 feet of a public secondary school, in violation of 21 U.S.C. §§ 841(a)(1) and 860(a), and with aiding and abetting in the distribution and possession with intent to distribute LSD, in violation 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On August 19, 1997, at the hearing on the government's motion to transfer, the court granted the government's oral motion to have the conspiracy charge against K.J.C. dismissed.

The government also filed a certification stating that K.J.C. is charged with a violent felony and that there is a substantial federal interest in this case which warrants the exercise of federal jurisdiction.[2] An evidentiary hearing on the government's motions to transfer was held on August 19, 1997, and August 27, 1997, at which the government presented the testimony of Leslie Elaine Nelson, John Spencer Pink, James Leidigh, Noel Washburn, Rich Gardner, Margaret Sellergren, Ann Vestle, Delvin Kling, Geoffrey Piller, Stewart Rowles, and Jack Swiderski.[3] Defendant K.J.C. offered no testimony. Defendant K.J.C. was present at the evidentiary hearing with his parents. The United States was represented by Assistant United States Attorney Richard L. Murphy. Defendant K.J.C. was represented by Mark Brown, Cedar Rapids, Iowa.

The court turns first to a brief review of the history of the Federal Juvenile Justice And Delinquency Prevention Act, 18 U.S.C. §§ 5031–5042 ("the Act"). The court will then review the standards applicable to motions to transfer juveniles to adult prosecution, and finally the court will conduct a legal analysis of the six statutorily mandated factors to determine whether the transfer of K.J.C. for adult prosecution is appropriate in this case.

## II. LEGAL ANALYSIS

### A. The Federal Juvenile Justice And Delinquency Prevention Act

The Act was enacted on September 7, 1974. The Act amended the Federal Juvenile Delinquency Act ("FJDA") which had remained virtually unchanged since Congressional enactment in 1938. The FJDA granted the Attorney General unlimited discretion in deciding whether to offer prosecution as a juvenile to any defendant under the age of eighteen not surrendered to state officials or charged with offenses punishable by life im-

prisonment or death. *See Cox v. United States,* 473 F.2d 334, 336 (4th Cir.) (concluding that Congress could legitimately grant the Attorney General discretion in deciding whether to prosecute a juvenile as an adult and that the exercise of such discretion did not require a hearing), *cert. denied,* 414 U.S. 869, 94 S.Ct. 183, 38 L.Ed.2d 116 (1973); *see also United States ex rel. Bombacino v. Bensinger,* 498 F.2d 875, 877 n. 7 (7th Cir.) (noting that "[w]hile it may be highly desirable to commit to the judge of a specialized juvenile court the determination of whether or not a particular juvenile is to be prosecuted criminally, we are aware of no constitutional requirement that a State must do so") (quoting *People v. Jiles,* 43 Ill.2d 145, 251 N.E.2d 529, 531 (1969)), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 492, 42 L.Ed.2d 292 (1974). Congress enacted the Act to provide federal courts with jurisdiction over certain juvenile delinquency proceedings. As was pointed out in the Senate Report, the 1974 amendment was "to provide basic procedural rights for juveniles who come under Federal jurisdiction and to bring Federal procedures up to the standards set by various model acts, many state codes and court decisions." S. REP. No. 1011, 93rd Cong., 2d Sess. 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5283, 5284.

The Act made four substantive changes to the FJDA: (1) the Act altered the definition of a juvenile, (2) the Act added the requirement for judicial approval before prosecuting a juvenile as an adult, (3) it placed limits on the number of offenses for which a juvenile could be tried as an adult, and (4) it provided for federal prosecution of juveniles when no state would exercise jurisdiction over the offender. *See* 18 U.S.C. § § 5031–5032. Congress subsequently amended the Act by its enactment of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, tit. II,

---

**2.** Juvenile delinquency proceedings are subject to the limitations set forth in 18 U.S.C. § 5038 on disclosure of the identity of the juvenile defendant and disclosure of information and records related to the juvenile proceedings. The documents in this case have thus been filed under seal using the juvenile's initials. Moreover, the evidentiary hearing on the government's motions to transfer was held in a courtroom closed to the general public.

**3.** The government's witnesses Stewart Rowles and Jack Swiderski, both Federal Bureau of Prison employees, testified telephonically. They were otherwise unavailable to testify in person. The parties had no objection to permitting these two witnesses to testify telephonically.

98 Stat.1976 (1984). Congress expanded the federal role in juvenile justice by authorizing the prosecution of juveniles as adults for additional offenses and mandating adult trial of juveniles in certain cases. 18 U.S.C. § 5032. Congressional passage of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–323, 108 Stat. 1796, further amended the Act. The Violent Crime Control and Law Enforcement Act authorizes the criminal prosecution of juveniles as young as thirteen years of age for certain serious felonies, including first and second degree murder, attempted murder, and bank robbery. 18 U.S.C. § 5032.[4]

### B. The Act's Framework

■ The Act provides a special framework for the prosecution of persons who are juveniles at the time a federal crime is committed.[5] The Act's purpose is to " 'remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation.' " *United States v. Doe*, 94 F.3d 532, 536 (9th Cir.1996) (quoting *United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir.1990)); *accord United States v. Angelo D.*, 88 F.3d 856, 858 (10th Cir.1996); *United States v. T.F.F.*, 55 F.3d 1118, 1120 (6th Cir.1995); *United States v. Juvenile Male No. 1*, 47 F.3d 68, 71 (2d Cir.1995); *United States v. One Juvenile Male*, 40 F.3d 841, 844 (6th Cir.1994). The Act's purpose, however, must be weighed against "the need to protect the public from 'violent and dangerous individuals and provid[e] sanctions for anti-social acts. And that balance must be struck by the district court in the context of a transfer hearing.' " *Doe*, 94 F.3d at 536; (quoting *United States v. Alexander*, 695 F.2d 398, 401 (9th Cir.1982) (citation omitted), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2458, 77 L.Ed.2d 1337 (1983)); *see T.F.F.*, 55 F.3d at 1121 ("[A] motion to transfer is properly granted where a court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation.") (quoting *One Juvenile Male*, 40 F.3d at 844).

In order to proceed against a juvenile in federal court, the Attorney General must certify to the appropriate district court, after investigation,

> that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or an offense described in section 841, 952(a), 955, or 959 of title 21, and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

If the Attorney General does not so certify, such juvenile shall be surrendered

---

**4.** Paragraph four of § 5032 provides in relevant part:

> A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against under this chapter unless he has requested in writing upon advice of counsel to be proceeded against as an adult, except that, with respect to a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence or an offense described in section 401 of the Controlled Substances Act ( 21 U.S.C. 841), or section 1002(a), 1005, or 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, 959), or section 922(x) of this title, or in section 924(b), (g), or (h) of this title, criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice. In the application of the preceding sentence, if the crime of violence is an offense under section 113(a), 113(b), 113(c), 1111, 1113, or, if the juvenile possessed a firearm during the offense, section 2111, 2113, 2241(a), or 2241(c), "thirteen" shall be substituted for "fifteen" and "thirteenth" shall be substituted for "fifteenth". 18 U.S.C. § 5032.

**5.** Under the Act, a " 'juvenile' is a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday...." 18 U.S.C. § 5301. Juvenile delinquency "is the violation of a law of the United States committed by a person prior to his eighteenth birthday ..." *Id.*

to the appropriate legal authorities of such State.

18 U.S.C. § 5032; *see Impounded (Juvenile I.H., Jr.)*, 120 F.3d 457, 462 (3d Cir.1997).[6]

Here, the government has certified defendant K.J.C. for prosecution in federal court pursuant to the third clause.[7] Once federal jurisdiction is obtained over the juvenile, the juvenile is generally subject to be proceeded against in juvenile delinquency proceedings unless the juvenile requests to be proceeded against as an adult or the district court, upon motion by the United States Attorney General and after a hearing, determines that transfer for adult criminal prosecution would be "in the interest of justice."[8] 18 U.S.C. § 5032.

The "substantial Federal interest" category was added to the Act as part of the Comprehensive Crime Control Act of 1984 in order to permit federal authorities to proceed against juveniles charged with particularly serious, violent offenses in criminal prosecutions. *United States v. Juvenile No. 1*, 118 F.3d 298, 303–04 (5th Cir.1997). The government has made such a motion to transfer defendant K.J.C. for adult criminal prosecution. Therefore, the court must address the appropriate standards for making the "interest of justice" determination under § 5032.

### C. Interest of Justice Determination

In determining whether transfer would be in the "interests of justice," the Eighth Circuit Court of Appeals has held that a district court must consider the six statutory factors identified in § 5032. *United States v. A.D.J.*, 108 F.3d 851, 852 (8th Cir.1997); *accord Juvenile No. 1*, 118 F.3d at 303; *United States v. Wellington*, 102 F.3d 499, 505 (11th Cir. 1996); *United States v. I.D.P.*, 102 F.3d 507, 510 (11th Cir.1996); *Doe*, 94 F.3d at 536; *United States v. Juvenile Male No.1*, 86 F.3d 1314, 1321 (4th Cir.1996); *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir.1995); *Juvenile Male No. 1*, 47 F.3d at 71; *United States v. Gerald N.*, 900 F.2d 189, 191 (9th Cir.1990). As explained in § 5032, those six factors are:

> the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems.

18 U.S.C. § 5032; *see Juvenile No. I*, 118 F.3d at 303; *A.D.J.*, 108 F.3d at 852; *Wellington*, 102 F.3d at 505; *I.D.P.*, 102 F.3d at 510; *Doe*, 94 F.3d at 536; *Juvenile Male No.1*, 86 F.3d at 1321; *Nelson*, 68 F.3d at 588; *Juvenile Male No. 1*, 47 F.3d at 71.

■■■ For purposes of the transfer hearing, a court may assume the juvenile commit-

---

**6.** Here, the government's motions to transfer were each signed by the United States Attorney for the Northern District of Iowa, Stephen J. Rapp, and had as an attachment a letter from Assistant Attorney General Jo Ann Harris, authorizing Rapp to seek the transfers on behalf of the Attorney General, pursuant to 28 C.F.R. § 0.57. Thus, under 28 C.F.R. § 0.57, the Assistant Attorney General Harris is authorized to redelegate authority to United States Attorney Rapp. *See Impounded (Juvenile I.H., Jr.)*, 120 F.3d 457, 462 n. 5 (3d Cir.1997); *United States v. Doe*, 98 F.3d 459, 460–61 (9th Cir.1996). Therefore, the motions themselves demonstrate that an authorized person made the decision to file the motions to transfer in this case.

**7.** The majority of the circuits to consider the issue have determined that the Attorney General's certification based on a "substantial Federal interest" is not subject to judicial review. *See United States v. Juvenile No. 1*, 118 F.3d 298, 300 (5th Cir.1997); *Impounded (Juvenile R.G.)*, 117 F.3d 730, 737 (3d Cir.1997); *United States v.*

*I.D.P.*, 102 F.3d 507 (11th Cir.1996), *petition for cert. filed*, (U.S. July 28, 1997) (No. 97–5383). *But see United States v. Juvenile Male No. 1*, 86 F.3d 1314 (4th Cir.1996) (holding certification is reviewable).

**8.** Although not applicable in this case, the second avenue by which a juvenile may be transferred to adult status is by way of the mandatory transfer provisions of section 5032. A district court is required to transfer a juvenile for adult prosecution if three factors are present:

> (1) the juvenile committed the act underlying the charged offense after his sixteenth birthday; (2) the charged offense is a felony that has as an element the use of physical force or by its nature involves the risk of physical force, or is an offense specifically enumerated in the paragraph; and (3) the juvenile has previously been found guilty of a crime that would satisfy factor (2). *Impounded (Juvenile R. G.)*, 117 F.3d at 732.

ted the alleged offenses. *Nelson,* 68 F.3d at 588; *One Juvenile Male,* 40 F.3d at 845; *In re Sealed Case,* 893 F.2d 363, 369 (D.C.Cir. 1990); *United States v. Doe,* 871 F.2d 1248, 1250 n. 1 (5th Cir.), *cert. denied,* 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989); *In re J. Anthony G.,* 690 F.Supp. 760, 763 (S.D.Ind.1988); *In re T. W.,* 652 F.Supp. 1440, 1442 (W.D.Wis.1987). The government bears the burden of rebutting the statutory presumption of juvenile treatment. *Nelson,* 68 F.3d at 588; *United States v. T.F.F.,* 55 F.3d 1118, 1120 (6th Cir.1995); *Juvenile Male No. 1,* 47 F.3d 68, 71; *United States v. A.R.,* 38 F.3d 699, 703 (3d Cir.1994). However, the government need only persuade the court by a preponderance of the evidence. *I.D.P.,* 102 F.3d at 513; *Juvenile Male No. 1,* 86 F.3d at 1323; *T.F.F.,* 55 F.3d at 1120; *United States v. Doe,* 49 F.3d 859, 868 (2d Cir.1995); *A.R.,* 38 F.3d at 703; *United States v. Parker,* 956 F.2d 169, 171 (8th Cir.1992). " 'Thus, a motion to transfer is properly granted where a court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation." *United States v. T.F.F.,* 55 F.3d at 1120 (quoting *United States v. One Juvenile Male,* 40 F.3d 841, 844 (6th Cir.1994)); *see Juvenile Male No. 1,* 86 F.3d at 1323 ("The 'interest of justice' analysis requires the court to 'balance the [rehabilitative] purposes against the need to protect the public from violent and dangerous individuals.' ") (quoting *United States v. Juvenile Male No. 1,* 47 F.3d 68, 71 (2d Cir.1995) (citation omitted)).

▆ It is clear that " '[t]he decision whether to transfer a juvenile to trial as an adult under 18 U.S.C. § 5032 is within the sound discretion of the trial court, provided the court employs and makes findings as to the six criteria outlined in the Code.' " *Juvenile No. 1,* 118 F.3d at 307 (quoting *United States v. Doe,* 871 F.2d 1248, 1255 (5th Cir.), *cert. denied,* 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989)); *accord Impounded (Juvenile R.G.),* 117 F.3d at 737; *Wellington,* 102 F.3d at 505; *I.D.P.,* 102 F.3d at 513; *Doe,* 94 F.3d at 536; *United States v. A.R.,* 38 F.3d 699, 702 (3d Cir.1994). In conducting the requisite six-factor analysis, the court is not required to give each factor equal

weight. *Juvenile No. 1,* 118 F.3d at 307; *Wellington,* 102 F.3d at 506; *Doe,* 94 F.3d at 536; *Juvenile Male No. 1,* 86 F.3d at 1323; *United States v. Three Male Juveniles,* 49 F.3d 1058, 1060 (5th Cir.1995); *Doe,* 871 F.2d at 1254–55; *United States v. M.H.,* 901 F.Supp. 1211, 1213 (E.D.Tex.1995). Instead, "[a] court may weigh the statutory factors as it deems appropriate and 'is free to determine how much weight to give each factor.' " *Wellington,* 102 F.3d at 506 (quoting *United States v. T.F.F.,* 55 F.3d 1118, 1120 (6th Cir.1995)); *accord Juvenile Male No.1,* 86 F.3d at 1321; *Nelson,* 68 F.3d at 588; *United States v. Juvenile Male No. 1,* 47 F.3d 68, 71 (2d Cir.1995); *A.R.,* 38 F.3d at 705; *Doe,* 871 F.2d at 1255; *United States v. Hemmer,* 729 F.2d 10, 17 (1st Cir.), *cert. denied sub non. Randazza v. United States,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States v. Alexander,* 695 F.2d 398, 401 (9th Cir.1982), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2458, 77 L.Ed.2d 1337 (1983). "Section 5032 simply requires a finding on the record as to each factor, but does not require that the magistrate judge state specifically whether each factor weighed for or against the transfer." *Wellington,* 102 F.3d at 505; *accord Three Male Juveniles,* 49 F.3d at 1061. Indeed, the Eleventh Circuit has held that "the procedure established by section 5032 does not require that a district court or magistrate judge provide any explanation as to why it treated any particular finding as weighing in favor of or against transfer." *Wellington,* 102 F.3d at 505.

### D. Application Of The Section 5032 Factors To This Case

As noted above, the court must consider each of the six factors enumerated in section 5032 when determining whether to transfer the juvenile for adult prosecution. The court will now consider each of the six § 5032 factors seriatim.

### 1. Age And Social Background

▆ The first of the six statutorily required factors the court must consider in the transfer calculus is the age and social background of the juvenile. The court should focus on the age of the juvenile at the time of

the alleged offense. *Doe,* 94 F.3d at 536; *Nelson,* 68 F.3d at 589. The court may also focus on the age of the juvenile at the time of the transfer hearing. *Doe,* 94 F.3d at 536; *Nelson,* 68 F.3d at 589.

K.J.C., who was born on September 10, 1979, was seventeen years old at the time of each of the charged offenses, as well as at the time of the transfer hearings. K.J.C.'s age at the time of the offenses weighs in favor of transfer. *Juvenile No. 1,* 118 F.3d at 307 (holding that juvenile's age of seventeen and one-half weighed in favor of transfer); *Doe,* 49 F.3d at 867 (finding that juvenile was sixteen and one-half at the time of one crime and seventeen at the time of another offense supported transfer); *A.R.,* 38 F.3d at 705 (affirming district court's conclusion that seventeen-year-old juvenile's age supported transfer); *Gerald N.,* 900 F.2d at 191 (holding that juvenile's age weighed in favor of transfer where juvenile was 17 years and 10 months old at time of offense); *United States v. Leon D.M.,* 953 F.Supp. 346, 348 (D.N.M.1996) (holding that because juvenile was three months short of his eighteenth birthday at the time of the crime favored transfer). Although the court believes that the closer a juvenile is to age eighteen the more appropriate it is to consider this factor as weighing in favor of transfer, the juvenile's age alone is not dispositive, and it must be viewed in the context of the other § 5032 factors.[9]

The other portion of this factor requires the court to examine the social background of K.J.C. K.J.C. resides with his parents in Cedar Rapids, Iowa and has just begun his senior year of high school at Washington High School. He has lived in Cedar Rapids his entire life. Both of K.J.C.'s parents are employed outside the home. K.J.C.'s father,

Thomas, is a systems analyst and works part-time at an area community college. K.J.C.'s mother, Kristine, is a production manager. K.J.C. has two older siblings, a sister, Heather, and a brother, Brennan. His sister has obtained a graduate degree in sports psychology and is employed in Chicago, Illinois. She is very supportive of K.J.C. Brennan is employed as a teacher in Cedar Falls, Iowa. K.J.C. has a good relationship with his family members, and they are all supportive of K.J.C. K.J.C.'s home environment is positive and suggests that it would support rehabilitative efforts directed toward K.J.C. *See Juvenile No. 1,* 118 F.3d at 308 (affirming district court's conclusion that the absence of strong family environment "would make rehabilitation prospects for the juvenile unlikely."); *United States v. M.L.,* 811 F.Supp. 491, 493 (C.D.Cal.1992) (holding that fact that juvenile came from an intact and supportive family weighed in favor of juvenile treatment); *United States v. H.M.M.S.,* 838 F.Supp. 30, 32 (D.P.R.1993) (noting that juvenile's prospects for rehabilitation "may be strengthened" by active family support); *United States v. Means,* 575 F.Supp. 1068, 1069 (D.S.D.1983) (holding that lack of strong family environment "militates against transfer."); *cf. T.F.F.,* 55 F.3d at 1120 (affirming district court's transfer of juvenile for adult prosecution where district court noted that juvenile "did not have a supportive family environment."); *Doe,* 49 F.3d at 867 (affirming transfer where juvenile was estranged from parents and instead associated with gang).

K.J.C. has had some trouble in school. K.J.C. has been diagnosed with Attention Deficit Disorder ("ADD"), and has been treated with Ritalin since the age of seven. He was suspended from high school twice in

---

**9.** The court notes that a number of courts have declined to transfer a juvenile to adult status after considering all six statutory factors even though the juvenile was seventeen at the time of the offense or the transfer hearing. *See, e.g., Doe,* 94 F.3d at 538 (holding with regard to seventeen year old juvenile charged with murder that district court's conclusion that the six factors tipped in favor of juvenile adjudication was not an abuse of discretion); *Juvenile Male No. 1,* 47 F.3d at 72 (holding that district court did not abuse its discretion in not transferring seventeen-year-old juvenile for distribution of cocaine

where evidence supported district court's finding that juvenile had received only a minimal treatment, had responded well to some prior treatment efforts, and that adequate juvenile programs did not exist within federal adult facility); *Leon D.M.,* 953 F.Supp. at 348 (holding that even though juvenile was seventeen and charged with murder, transfer for adult prosecution was not in the interests of justice); *United States v. C.J.T.G.,* 913 F.Supp. 63, 65 (D.P.R.1994) (declining to transfer seventeen year old juvenile who was charged with aiding and abetting carjacking, and possessing firearm during carjacking).

his junior year as a result of his involvement in a fight, and for insubordinate behavior in class. Nonetheless, K.J.C. is liked by his teachers and is not viewed as a troublemaker or a disruptive influence in the classroom.[10] Although K.J.C.'s grades have been spotty, he has demonstrated the ability to do excellent work in fields of special interest to him, such as photography. This attests to K.J.C.'s ability to direct his attention and focus on a subject. Both are attributes necessary for the rehabilitative process to have its intended effect.

K.J.C. has been employed the past two years by the Elm Crest Country Club as a counselor in its summer youth activities club. As a counselor, K.J.C. was responsible for the care and supervision of four to five children. He is described by his supervisor, Leslie Nelson, as being a "fantastic" worker. He was always on time and very dependable. Again, these are attributes which may be employed to achieve rehabilitation. K.J.C.'s ability to work within a structured setting also indicates that he is amenable to rehabilitative efforts. The court finds that K.J.C.'s social background would be a major factor in his ability to be rehabilitated. The court reaches this conclusion based on K.J.C.'s supportive family environment, K.J.C.'s positive family relationship with his parents and siblings, his excellent work ethic, and his conduciveness to supervision. Thus, the court concludes that K.J.C.'s social background, taken as a whole, must be considered to weigh against transfer.

Because K.J.C.'s age weighs in favor of transfer while his social background weighs against it, the court concludes that this first factor is neutral in the transfer analysis.

### 2. *Nature Of The Alleged Offense*

The second factor the court must consider is the nature of the alleged offenses. For purposes of the transfer hearing, the court has assumed that K.J.C. committed the alleged offenses. *Nelson*, 68 F.3d at 588; *One Juvenile Male*, 40 F.3d at 845; *In re Sealed Case*, 893 F.2d at 369; *Doe*, 871 F.2d at 1250 n. 1. Concerning this particular factor, section 5032 states:

In considering the nature of the offense, as required by this paragraph, the court shall consider the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms. Such a factor, if found to exist, shall weigh in favor of a transfer to adult status, but the absence of this factor shall not preclude such a transfer.

18 U.S.C. § 5032.

Additionally, several circuit courts of appeals have held that "a district court is entitled to give more weight to the seriousness of the offense than to other factors when determining the realistic chance for rehabilitation." *Wellington*, 102 F.3d at 505 (affirming district court's giving substantial weight to offense of carjacking in which victim was repeatedly shot); *accord Juvenile No. 1*, 118 F.3d at 307 (holding that the seriousness of the offense can be given more weight than other factors in determining whether a transfer is appropriate); *Juvenile Male No. I*, 86 F.3d at 1323 ("In the weighing of the various factors, the nature of the crime clearly predominates."); *Nelson*, 68 F.3d at 590 (in remanding case, the court of appeals noted that "[t]he heinous nature of the crime of intentional murder certainly may be a factor entitled to special weight."); *One Juvenile Male*, 40 F.3d at 845 (affirming district court's emphasis of the violent nature of the crime where the defendant was charged with carjacking in which a victim was shot in the head and killed); *A.R.*, 38 F.3d at 705 (affirming district court's decision to give great weight to offense of carjacking and the use of pistol to threaten victim); *Doe*, 871 F.2d at 1255 (in affirming the district court's consideration of the violent crime charged, armed robbery, the court of appeals noted that "the seriousness of the crime obviously can be given more weight than other factors in determining whether there is a 'realistic chance' of rehabilitation, and hence whether a transfer is appropriate."); *United States v. Hemmer*, 729 F.2d 10, 17 (1st Cir.) (holding

---

**10.** The court notes that even though K.J.C. received a failing grade for algebra his fifth recording period, his teacher for that class, Mr. Rhine, noted on his report card that K.J.C. was a pleasure to have in class.

that in light of the severity of crime involved, when weighed against the other five factors, district court did not strike improper balance in ordering transfer to adult status), *cert. denied sub nom. Randazza v. United States,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States v. Alexander,* 695 F.2d 398, 401 (9th Cir.1982) (affirming district court's conclusion that the seriousness of the crime, premeditated murder and multiple wounding by gunshot of four individuals, outweighed the potential for rehabilitation).

Here, on the afternoon of April 30, 1997, K.J.C. drove a friend, Ryan Washburn, to the vicinity of the Mercantile Bank of Eastern Iowa in Cedar Rapids. Washburn had previously talked to K.J.C. about committing robberies, including bank robbery. Washburn was at K.J.C.'s home when K.J.C. arrived home from school on April 30. Washburn told K.J.C. that he was intent on robbing a bank that day. K.J.C. quizzed Washburn about how he was going to rob a bank without a gun. Washburn replied, "Trust me. I'll do it." K.J.C. owed Washburn $180 for drugs that Washburn had previously sold to K.J.C. K.J.C. agreed to drive Washburn to the bank in exchange for Washburn forgiving K.J.C.'s drug debt, and providing K.J.C. with ten percent of the bank robbery proceeds. K.J.C. drove by the bank once to ensure that no one was present and then dropped Washburn off at a parking lot near the bank. Washburn told K.J.C. that he would call him later. K.J.C. then left to pick up his mother from her place of employment.[11] Washburn proceeded to rob the bank of approximately $15,050.00 using a replica pistol. Washburn's plans then went astray. Acting upon a bank employee's report of the bank robbery, two Cedar Rapids police officers arrived at the bank just as Washburn was exiting it. When Washburn pointed his replica weapon in the direction of the officers, one of the officers fatally shot Washburn.

In February 1997, Washburn had sent a money order for $1,300 to a former classmate living in Arizona in order to purchase LSD. K.J.C. contributed $100 toward the purchase of the LSD from Arizona. K.J.C. sold LSD to five classmates in February 1997. Some of the sales occurred on the property of Washington High School in Cedar Rapids. K.J.C. and Washburn were involved in the selling of LSD in order to make money. K.J.C. used the proceeds from his sales of LSD to take a trip over spring break.

In examining the bank robbery offense, the court observes that there is no evidence in the record that K.J.C. was involved in its planning, or took a leadership role in its commission. Indeed, the court finds that his actual involvement can best be described as minimal. He only offered the 'would be' bank robber, Washburn, a means of transport to the bank. K.J.C.'s actions in furtherance of the bank robbery offense here stand in sharp contract to those of the juveniles in *United States v. G.T. W.,* 992 F.2d 198, 199 (8th Cir.1993). In that case a seventeen-year-old juvenile participated in armed robbery of bank, during which the juvenile held a revolver to the head of bank customer and his accomplice discharged a firearm in the bank during the robbery. Id. Thus, the court concludes that K.J.C.'s minor involvement in the commission of the bank robbery militates against transfer.

K.J.C.'s involvement in the sale of LSD to classmates is more compelling. Section 5032 specifically provides that where a juvenile influenced other persons to take part in criminal activities involving the use of controlled substances, such action weighs in favor of a transfer to adult status. K.J.C.'s sale of LSD to classmates meets such a classification. However, the mere fact that K.J.C. was involved in LSD drug sales does not necessarily require the court to weigh this factor heavily in favor of transfer. While K.J.C. profited from these sales, some of the sales can be characterized as accommodation sales. K.J.C. can best be described as a low-level dealer. Although the offenses alleged, namely the sale of LSD near a school, are quite serious, K.J.C. did not commit an act of violence in the commission of those offenses, nor are the circumstances of these offenses particularly heinous or striking. The court

---

11. Washburn planned on making his escape after the bank robbery by means of the Cedar Rapids' sewer system.

further notes that the government has not come forward with evidence that K.J.C. possessed weapons or firearms in the furtherance of his drug sales, a factor several courts have deemed to be significant. *See United States v. Doe,* 710 F.Supp. 958, 962 (S.D.N.Y. 1989); *United States v. J.D.,* 525 F.Supp. 107, 110 (S.D.N.Y.1981). Accordingly, the court concludes that while the nature of the alleged controlled substance offenses here weighs in favor of transfer, the nature of the offenses does not weigh heavily in favor of transfer. *Compare United States v. T.L. W.,* 925 F.Supp. 1398, 1403 (C.D.Ill.1996) (holding where juvenile was not a low-level dealer and had possessed a pistol that the nature of the alleged offenses weighed heavily in favor of transfer).

### 3. *Prior Delinquency Record*

The next factor the court is required to examine in determining whether or not to transfer K.J.C. is his prior delinquency record. Here, K.J.C. has only one instance of delinquency in his record, a charge of criminal mischief. On August 7, 1995, K.J.C. and three other juveniles spray painted graffiti on the side of a Jack's store in Cedar Rapids. K.J.C. was fifteen at the time of the offense. K.J.C. agreed to pay restitution for the damage done to the store. On September 19, 1995, K.J.C. paid restitution in the sum of $266.25, which represented one-quarter of the damage done to the store front. The court takes specific note of the fact that K.J.C.'s sole juvenile offense did not involve violence. The court concludes that K.J.C.'s limited delinquency record weighs against transfer because such a limited record of juvenile criminal involvement supports the notion that he can be rehabilitated by the time he reaches age twenty-one. *See Leon D.M.,* 953 F.Supp. at 348 (holding that delinquency record concerning single incident involving malicious mischief, a minor drug violation, and disorderly conduct did not support transfer); *United States v. Nelson,* 921 F.Supp. 105, 114 (E.D.N.Y.) (concluding that absence of juvenile record "clearly favors" treatment as a juvenile), *aff'd,* 90 F.3d 636 (2d Cir.1996); *M.L.,* 811 F.Supp. at 495 (holding that juvenile's lack of a juvenile record "weighs in favor of treating him as a juvenile, since it

increases the likelihood that he can be rehabilitated by the time he reaches age 21."). The court notes that K.J.C.'s minimal juvenile record pales in comparison to those cases where courts have concluded that a significant juvenile record supported transferring the juvenile for adult prosecution. *See e.g., Juvenile No. 1,* 118 F.3d at 309 (juvenile's record of charges for running away, theft, and engaging in organized criminal activity "demonstrates a pattern of continuous lack of respect for authority."); *Gerald N.,* 900 F.2d at 191 (juvenile had what court termed an "extensive six-year history of delinquency"); *United States v. Jerry Paul C.,* 929 F.Supp. 1406, 1409 (D.N.M.1996) (although juvenile was fifteen at the time of the charged offense he had already compiled a serious juvenile record which included firearms violations, assault and battery and multiple burglaries); *T.L. W.,* 925 F.Supp. at 1403 (juvenile had been charged with at least eighteen separate offenses, ranging from aggravated battery to failure to signal when required); *In re T.W.,* 652 F.Supp. 1440, 1444 (E.D.Wis.1987) (juvenile's record included drug violations, stealing bicycle parts, truancy violations, assaultive behavior, curfew violations, and an extensive history of problems at school which included striking a teacher); *United States v. Means,* 575 F.Supp. 1068, 1070 (D.S.D.1983) (defendant had numerous problems as a juvenile, progressively becoming more serious as he got older, which included burglary, driving under the influence, fraud charges, disorderly conduct, curfew violations, and driving a stolen car). The court turns next to consider K.J.C.'s intellectual development and psychological maturity.

### 4. *Intellectual Development And Psychological Maturity*

K.J.C. has long been afflicted with ADD which has required him to take medication. Despite this affliction, K.J.C. has progressed through high school and has begun his senior year of high school. His teachers view him as having average maturity. K.J.C.'s academic performance has been inconsistent. He has, however, demonstrated the ability to complete an independent photography pro-

ject. The court has not been provided with any results from intelligence tests or psychological examinations. Nonetheless, the court views K.J.C. as having at least average intelligence and age appropriate psychological maturity. Analysis of this factor does not reflect the existence of any condition which would hinder K.J.C.'s potential for rehabilitation. Indeed, each witness who was questioned about K.J.C.'s possible likelihood for rehabilitation testified that they were of the opinion that K.J.C. was a good candidate for rehabilitation.

A number of district courts have noted that more mature and developed juveniles are " 'more likely to be beyond redemption' " and that therefore " 'it is in keeping with the statutory premise ... to view immaturity and lack of development as factors weighing against transfer to adult status and maturity and development as factors weighing in favor of transfer.' " *M.L.*, 811 F.Supp. at 496 (quoting *J.D.*, 525 F.Supp. at 110); *accord Doe*, 710 F.Supp. at 961 (agreeing with view exposed in *J.D.* and concluding that juvenile's immaturity suggested that transfer was inappropriate); *see Nelson*, 921 F.Supp. at 116 (finding that because twenty-year-old juvenile had the personality and intellectual development of a juvenile, these facts favored treating defendant as a juvenile); *see also Doe*, 49 F.3d at 868 (concluding that juvenile's repeated criminal acts when coupled with an above average intelligence suggest a streetwise individual who is not a candidate for rehabilitation). Here, because the court does not view K.J.C. as having above average intelligence and only having maturity commensurate with his age, the court does not believe that K.J.C.'s intelligence and maturity stand as an obstacle to his rehabilitation, but instead concludes that K.J.C. has a reasonable prospect for rehabilitation if treated as a juvenile. The court arrives at this conclusion based on K.J.C.'s ability to take direction and his conduciveness to supervision. These attributes distinguish K.J.C. from the juveniles found in *A.D.J.*, 108 F.3d at 852–53 and *G.T.W.*, 992 F.2d at 199–200. In *A.D.J.*, the Eighth Circuit Court of Appeals affirmed the district court's decision to transfer for adult prosecution a juvenile charged with assault of person having lawful charge, custody, and control of mail matter with intent to rob, steal, and purloin such mail matter, and use of a firearm during and in relation to assault and robbery. *A.D.J.*, 108 F.3d at 852. In arriving at this decision the court noted that the juvenile "was at times 'hostile, resentful, and unable to take directions or discipline.' " *Id.* K.J.C. does not suffer from such limitations. Similarly, in *G.T. W.*, the court found the juvenile bank robber in that case to not be a promising candidate for rehabilitation because he had been "stubbornly uncooperative" with past supervision efforts. *G.T. W.*, 992 F.2d at 199. Here, again in contrast, K.J.C. does not suffer from such a character flaw but instead has demonstrated his readiness to react favorably to supervision. Thus, the court concludes K.J.C.'s intellectual development and psychological maturity weigh slightly against transfer.

### 5. *Past Treatment Efforts*

The fifth statutory factor is past treatment efforts and their success or lack of effectiveness. As far as the court is aware, K.J.C. has not been the subject of any prior treatment efforts. The complete absence of any treatment efforts suggests that an attempt at rehabilitation should be undertaken. Such an attempt at treatment is entirely in keeping with the Act's statutory policy of favoring treatment and rehabilitation. *See Doe*, 94 F.3d at 536 (stating that one of the purposes of the Act is to "encourage treatment and rehabilitations"); *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir.1996) ("Permeating the transfer decision and the six-factor inquiry is the notion of rehabilitation."), *cert. denied*, —— U.S. ——, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); *Angelo D.*, 88 F.3d at 858 (concluding that one of the purposes of the Act is to "encourage treatment and rehabilitation"); *Nelson*, 68 F.3d at 590 ("Rehabilitation clearly is one of the primary purposes of the juvenile delinquency provisions."); *T.F.F.*, 55 F.3d at 1120 (noting that one of the purposes of the Act is to "encourage treatment and rehabilitation"); *Juvenile Male No. I*, 47 F.3d at 71 (same); *One Juvenile Male*, 40 F.3d at 844 (same); *Brian N.*, 900 F.2d at 220 (same); *In re Sealed Case*, 893 F.2d at 367 (concluding that "the Act's underlying purpose is to rehabilitate");

*Doe*, 871 F.2d at 1253 (stating that rehabilitation is a priority under the Act). Moreover, the government has not come forward with any evidence that would indicate that K.J.C. is unamenable to treatment or is otherwise ill-suited to treatment. Thus, the court concludes that the complete absence of any prior attempts at treatment causes this factor to weigh in favor of not transferring K.J.C. for adult prosecution. *Juvenile Male #1*, 47 F.3d at 72 (affirming district court's decision to weigh juvenile's minimal prior treatment more heavily than the seriousness of the offense and his prior record); *In re T. W.*, 652 F.Supp. 1440, 1445 (E.D.Wis.1987) (holding that it was not in interest of justice to transfer sixteen-year-old juvenile who was alleged to have committed homicide during robbery where no past treatment efforts had been made).

### 6. *The Availability Of Programs For Treatment*

■ The final factor the court must consider is the availability of programs for treatment. The government bears the burden to show that there is a lack of available programs designed to treat defendant's problems. *Nelson*, 68 F.3d at 583; *Leon D.M.*, 953 F.Supp. at 349. The government presented the testimony of Ann Vestle, a United States Probation Officer in the Northern District of Iowa. She testified, based on her conversation with Greg Hart, a case manager with the Federal Bureau of Prison's community corrections office in Minneapolis, Minnesota, that due to the relatively low number of juveniles in the federal criminal justice system, the federal government does not itself run any treatment programs for juveniles, but rather contracts with outside agencies to provide treatment services. She testified that K.J.C.'s chance of gaining admittance to such a program is very slight. For instance, one program is limited to juveniles with inhalant abuse, a condition from which K.J.C. does not suffer. An additional restriction is that most programs have age limits, and K.J.C. is almost eighteen. Furthermore, the program at the Lake Region Law Enforcement Center in Devils Lake, South Dakota

has a waiting list and is limited to only thirteen beds. Testimony was also received regarding the Southwest–Multi Correctional Center located in Dickinson, North Dakota, which can hold juveniles until their twenty-first birthday but is limited to forty-four beds.

Vestle's testimony was supported and augmented by two officials with the Federal Bureau of Prisons, Stewart Rowles, a Management Center Administrator, and Jack Swiderski, Community Corrections Manager for the Bureau of Prisons' juvenile districts of North Dakota, South Dakota and Minnesota. The Federal Bureau of Prisons currently has three types of contract facilities available for housing juvenile offenders: secured facilities, community-based programs, and boarding schools. There is little difference between the boarding facilities and the community-based programs. The largest distinction lies between the community-based programs and the secured detention facilities. The secured detention facilities provide a maximum amount of supervision for offenders, and are locked facilities. With one exception, the secured facilities in the north-central region offer placement for offenders up to the age of twenty-one.[12] There are four secured facilities in the north-central region at which K.J.C. may be placed. Three of the facilities are located in North Dakota and one is located in Wisconsin. The three secured North Dakota facilities are the North Dakota Youth Correctional Center in Mandan, North Dakota, the Lake Regional Law Enforcement Center, and the Southwest Multi County Correctional Center. In addition to the North Dakota facilities, the Lincoln Hills School in Irma, Wisconsin, is available as a secured facility. The North Dakota Youth Correctional Center offers a state accredited senior high school and G.E.D. program. It also offers vocational training programs and the following treatment programs: general development; parenting; family living; life skills; drug and alcohol treatment; aggression replacement training; pre-sex offender; work experience; recreational therapy; case management ses-

---

12. The secured juvenile facility located on the Pine Ridge reservation in South Dakota is the only secured facility in the north central region which does not house juveniles until the age of twenty-one.

sions; cognitive restructuring modality; and individual counseling. Similarly, the Lake Regional Law Enforcement Center offers both a high school education and a G.E.D. program. Vocational training in a wide variety of subjects is offered through instructors from the University of North Dakota and the Lake Area Vo-Tech Center. The Lake Regional Law Enforcement Center offers chemical dependency treatment, sex offender treatment and individual treatment programs. Likewise, the Southwest Multi County Correctional Center offers a G.E.D. program as well as accredited high school and college correspondence courses conducted in a classroom setting. Vocational training in welding, construction, and electrical wiring is offered. Treatment programs offered at the Southwest Multi County Correctional Center include mental health services, sex offender treatment, and drug and alcohol addiction treatment.

Community-based facilities operate under the supervision of staff members, and provide offenders with more freedoms and greater flexibility in their scheduling. Juvenile offenders at such facilities may be allowed to participate in community activities, such as public schooling. Some of the community-based facilities in South Dakota are limited to juvenile offenders between the ages of twelve and eighteen. The Black Hills Special Services Cooperative in Sturgis, South Dakota, however, offers an independent living program for offenders up to the age of twenty-one. The Black Hills Special Services Cooperative offers educational programs such as a G.E.D. program and a regular high school education. It also offers individual treatment programs on request as well as drug and alcohol programs as needed. K.J.C. would also be eligible for placement in the non-secure program at the Missouri River Adolescent Centers in Chamberlain and Springfield, South Dakota. The Missouri River Adolescent Centers offers an in-house school program with an alternative classroom setting. The centers also offer "positive peer interaction" group counseling. This counseling includes anger management and victim awareness. In addition, intense drug and alcohol abuse treatment is offered at the centers.

In the north-central region, the majority of the Federal Bureau of Prison's contract juvenile facilities are located in North and South Dakota. However, when necessary, it is possible for a juvenile from this region to be sent to a facility in another region. One significant difference between the adult programs and the juvenile programs offered through the Federal Bureau of Prisons lies in the emphasis given to education in the juvenile programs. The majority of juvenile offenders currently reside in community-based programs.

If placed on probation, K.J.C. could be placed in a non-secure facility as part of his probation. In addition, if K.J.C. was placed on probation, programs exist in the community that could provide him with either inpatient or outpatient drug treatment services. Furthermore, mental health counseling is available in the community from either public or private agencies.

Because the government presented evidence of possible juvenile treatment programs available for K.J.C. in the Federal Bureau of Prisons, the court concludes that appropriate programs are available for the treatment of K.J.C. for treatment. Neither the Act nor case precedents, however, require the court to identify a specific program that will accept *K.J.C. Nelson,* 68 F.3d at 590; *Juvenile Male No. 1,* 47 F.3d at 72; *Gerald N.,* 900 F.2d at 191. The court notes that K.J.C. appears to have a substance abuse problem and that most, if not all, of the juvenile facilities which contract with the Federal Bureau of Prisons maintain programs that provide substance abuse counseling for their juvenile wards. Thus, the court concludes that the existence of possible juvenile treatment programs for K.J.C. causes this factor to weigh in favor of juvenile treatment for K.J.C. *See Alexander,* 695 F.2d at 400 (although recognizing that availability of programs to treat sixteen-year-old defendant pointed in favor of not transferring, nonetheless concluded that the seriousness of the offense, the premeditated murder of four people, clearly outweighed the availability of treatment factor); *T.L. W.,* 925 F.Supp. at 1404 (concluding that sixth factor weighed in favor of juvenile treatment where the government "presented evidence of possible juvenile treatment programs available in the

Bureau of Prisons."); *M.L.*, 811 F.Supp. at 496–97 (holding that because a variety of programs were available for the treatment of the defendant as a juvenile that the sixth factor weighed "slightly in favor" of juvenile treatment); *cf. Leon D.M.*, 953 F.Supp. at 349 (concluding that "[a] juvenile charged with murder should not be transferred to adult status absent evidence on the availability of programs designed to treat his behavioral problems."). The existence of juvenile programs that are available for the treatment of K.J.C. is particularly significant in this case since K.J.C. has never undergone prior juvenile treatment. The significance of this factor is increased by the fact that each witness who was questioned about K.J.C.'s possible likelihood for rehabilitation testified that they believed K.J.C. was a good candidate for rehabilitation. Thus, there appears to be a good chance K.J.C. can be rehabilitated to become a useful member of society.

### III. CONCLUSION

■ The court concludes, upon balancing the six § 5032 factors, that the interests of justice do not warrant transferring K.J.C. for adult prosecution. The court finds that particular weight must be given to three of the § 5032 factors in this case. First, the court finds it significant that defendant has no significant prior contact with the criminal justice system. On the theory that the special treatment given juveniles reflects, at least in part, rehabilitative goals, a lack of a meaningful juvenile criminal record suggests that K.J.C. may benefit from juvenile treatment. The second factor the court finds particularly significant here is the absence of past treatment efforts. Because K.J.C. has no history of treatment and the possibility of rehabilitation through treatment efforts remains a viable possibility for him, this factor weighs against transfer in this case. A third factor, the availability of treatment programs, also weighs against transferring K.J.C. for adult prosecution. In addition, the court views a fourth factor, K.J.C.'s intellectual development and psychological maturity, to weigh slightly against transfer. The court concludes that K.J.C.'s intelligence and maturity does not stand in the way of his rehabilitation, but rather finds that K.J.C.'s prospects for rehabilitation are promising if

treated as a juvenile based on his ability to take direction and his conductiveness to supervision. The court further concludes that one factor is neutral in this analysis: K.J.C.'s age and social background. The only factor that weighs in favor of transferring K.J.C. at all is the nature of the offenses alleged. The court finds that this factor, when balanced against the other factors, does not indicate that transfer is appropriate. Although the offenses alleged, in particular the sale of LSD near a school, are quite serious, the court notes that K.J.C. does not appear to have been involved in the bank robbery's planning nor did he take a leadership role in its commission, but instead was only a minimal participant in that offense. K.J.C.'s drug offenses do not alter the analysis that K.J.C. can best be described as a low-level dealer, and some of his drug sales might well be characterized as accommodation sales. Additionally, K.J.C. was not armed and did not commit an act of violence in the commission of those offenses, nor are the circumstances of these offenses particularly heinous or striking. For these reasons, the court does not believe that the nature of the offenses alleged outweigh the other factors and require K.J.C.'s transfer in this case. The court's conclusion is not changed by the government's submission of evidence of uncharged crimes or other bad acts committed by K.J.C. Specifically, the government presented evidence that K.J.C. had used LSD and marijuana, violated the curfew conditions of his release by attending a party, committed other acts of spray painting graffiti, had stolen a security camera, shoplifted items and engaged in an act of sexual abuse. This evidence does not fit neatly into any of the six factors the court is required to consider. While the court deems such evidence troubling, it does not necessitate a different result in this case. The court concludes that K.J.C. is a promising prospect for rehabilitation if treated as a juvenile. For these reasons, and the reasons stated above, the court denies the government's motions to transfer K.J.C. to adult status.

**IT IS SO ORDERED.**